# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DONOVAN TANNER,

       Plaintiff,

vs.                                                   No. CIV 11-0328 JB/ACT

SAN JUAN COUNTY SHERIFF'S OFFICE,
An agency of SAN JUAN COUNTY, New Mexico,
and Deputy Sheriff  DALE FRAZIER,
Individually, and as an Employee of
SAN JUAN COUNTY SHERIFF'S OFFICE,
and Deputy Sheriff TERRY McCOY, individually
and as an Employee of SAN JUAN COUNTY
SHERIFF'S OFFICE,

and

FARMINGTON POLICE DEPARTMENT,
an Agency of the CITY OF FARMINGTON,
New Mexico, and MISTY TAYLOR,
Individual, and as an Employee of,
FARMINGTON POLICE DEPARTMENT,

       Defendants.

## <u>AMENDED MEMORANDUM OPINION AND ORDER</u>[1]

     **THIS MATTER** comes before the Court on Defendant Misty Taylor's Motion for Summary

Judgment Based on Immunity, filed June 6, 2011 (Doc. 16)("Motion").  The Court held a hearing

on February 16, 2012.  The primary issues are: (i) whether Defendant Misty Taylor violated Plaintiff

---

     [1]On page eighty-one of its Memorandum Opinion and Order, filed March 15, 2012 (Doc. 45)("MOO"), the Court made a typographical error by incorrectly referring to Myron Tanner, Plaintiff Donovan Tanner's brother, as laying on the ground while Defendant Dale Frazier was allegedly using excessive force.  <u>See</u> MOO at 81 ("Thus, she had no duty to intervene in any potentially excessive force Frazier used against D. Tanner while <u>M. Tanner</u> was on the ground." (emphasis added)).  The underlined portion of the quoted sentence from the MOO should refer to D. Tanner, as opposed to M. Tanner.  The Court will amend the MOO to correct this typographical error.

Donovan Tanner's rights under the Fourth Amendment to the United States Constitution by not intervening during his allegedly unlawful detention and arrest; (ii) whether Taylor violated Tanner's Fourth Amendment rights by not intervening in Defendant Dale Frazier's allegedly excessive use of force; (iii) whether Taylor violated Tanner's Fourth Amendment rights by not intervening in Defendant Terry McCoy's allegedly excessive use of force; and (iv) whether, assuming any violations occurred, Taylor violated clearly established law. The Court will grant the Motion. The Court concludes that Taylor had no obligation to intervene in the investigatory detention and subsequent arrest that Frazier conducted, because a reasonable officer in her position would have believed that Frazier had both reasonable suspicion and probable cause that D. Tanner had committed several offenses. Based on the information available to Taylor, the level of force Frazier used, and the surrounding circumstances of the incident, Frazier's conduct never triggered a duty for Taylor to intervene in the context of D. Tanner's excessive force claim. In light of the minimal amount of force McCoy used and the surrounding circumstances of the incident, Taylor had no reason to believe that McCoy used excessive force. Assuming that some of Frazier's conduct triggered a duty for Taylor to intervene, she did not violate any clearly established law by failing to intervene. Assuming that Frazier's conduct triggered a duty to intervene, Taylor had no realistic opportunity to intervene, because she was occupied with Myron Tanner, D. Tanner's brother. Finally, assuming that McCoy's conduct triggered a duty to intervene, that his conduct lasted for approximately three seconds prevented Taylor from having a realistic opportunity to intervene.

## FACTUAL BACKGROUND

D. Tanner disputes some of Taylor's asserted facts. See Plaintiff's Response to Defendant Misty Taylor's Motion for Summary Judgment Based on Immunity at 5-10, filed June 27, 2011 (Doc. 21)("Response"). Taylor argues that D. Tanner does not properly controvert many of her

asserted facts in compliance with the local rules.  <u>See</u> Reply in Support of Defendant Misty Taylor's Motion for Summary Judgment Based on Immunity at 2-3, filed July 11, 2011 (Doc. 25)("Reply"). D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  In contravention of D.N.M.LR-Civ. 56.1,[2] D. Tanner does not readily distinguish between Taylor's asserted facts which he intends to dispute and any additional material facts which he seeks to assert.

At approximately 11:45 p.m. on March 17, 2011, St. Patrick's Day, Taylor was on routine patrol, driving in her police vehicle on West Main Street in Farmington, New Mexico.  <u>See</u> Memorandum in Support of Defendant Taylor's Motion for Summary Judgment ¶ 1, at 2, filed June 6, 2011 (Doc. 17)("Memorandum in Support of Motion")(setting forth this fact); Statement of Officer Misty Taylor ¶ 1, at 1 (not dated), filed June 6, 2011 (Doc. 17-1)("Taylor Statement"); Internal Affairs Interview of Taylor ¶ 3, at 4 (not dated), filed June 6, 2011 ("Taylor Interview"); Response at 5 (not disputing this fact).  While driving, Taylor observed a San Juan County Sheriff's patrol vehicle stopped on Commercial Street about three car-lengths south of Main Street.  <u>See</u> Memorandum in Support of Motion ¶ 1, at 2 (setting forth this fact); Taylor Statement ¶ 1, at 1; Taylor Interview ¶ 3, at 4; Response at 5 (not disputing this fact).  There was a crowd of between twelve to fifteen people standing near the vehicle.  <u>See</u> Memorandum in Support of Motion ¶ 1, at

---

[2]The applicable portion of this rule states:

Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. . . . Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).

2; Taylor Statement ¶ 1, at 1; Taylor Interview ¶ 3, at 4.[3]  Taylor stopped her vehicle to assist the

San Juan County Sheriff's officer, Frazier, and to find out what was occurring.  See Memorandum

in Support of Motion ¶ 2, at 2 (setting forth this fact); Taylor Statement ¶ 2, at 1; Response at 5 (not

disputing this fact).  When Taylor exited her vehicle, she could hear Frazier yell out verbal

commands, but could not make out what he was saying.  See Memorandum in Support of Motion

¶ 3, at 2; Taylor Statement ¶ 2, at 1; Taylor Interview ¶ 3, at 4; Response at 5 (not disputing this

fact).  It is disputed to whom Frazier was directing these verbal commands.[4]

Taylor observed D. Tanner and another man who was D. Tanner's brother, M. Tanner,

walking toward Frazier's vehicle, and heard Frazier instruct them to stop.  See Memorandum in

Support of Motion ¶ 4, at 2 (setting forth this fact); Taylor Statement ¶¶ 3-9, at 1; Taylor Interview

¶ 4, at 4-5; Response at 5 (not disputing this fact).  It is disputed whether D. Tanner and M. Tanner

were obeying Frazier's instructions, or attempting to leave the scene against Frazier's orders,

---

[3]Taylor sets forth an asserted fact that she saw approximately twenty-five people standing near the stopped vehicle.  See Memorandum in Support of Motion ¶ 1, at 2 (setting forth this fact). D. Tanner disputes this asserted fact and relies on a Complaint Investigation Report that the San Juan County Sheriff's Office generated which relates that Frazier stated there were between twelve to fifteen people near the vehicle.  See Response ¶ 6, at 6; Complaint Investigation Report at 6 (dated March 17, 2011), filed June 27, 2011 (Doc. 21-5).  This evidence specifically controverts the asserted fact, and the Court will modify the asserted fact to reflect that there were between twelve to fifteen people near the vehicle.  See D.N.M.LR-Civ. 56.1(b).

[4]Taylor asserts that she heard Frazier yell out verbal commands to the crowd.  See Memorandum in Support of Motion ¶ 2, 1 (setting forth this fact); Taylor Statement ¶ 2, at 1; Taylor Interview ¶ 3, at 4.  D. Tanner disputes this fact and asserts that Frazier was yelling at D. Tanner, his brother -- M. Tanner -- and at a female individual who identified herself as a Native American. See Response ¶ 3, at 5 (setting forth this fact); DVD Recording of Officer Dale Frazier's Dashboard Camera at 23:44:45-45:01 (taken March 17, 2011), filed June 27, 2011 (Doc. 34-1)(Ex. 2)("Frazier Dashboard Camera"); DVD Recording of Officer Misty Taylor's Dashboard Camera at 23:44:45-45:01 (taken March 17, 2011), filed June 27, 2011 (Doc. 34-2)(Ex. 3)("Taylor Dashboard Camera"). There are indications on the video that Frazier is directly speaking to certain individuals, including a female voice, as opposed to the entire crowd.  Thus, drawing all reasonable inferences and resolving all doubts in D. Tanner's favor, the Court will consider this fact disputed.

although Frazier's dashboard camera indicates that the men were walking away from Frazier and someone immediately afterward said "Let's go" before Frazier started yelling.[5]  Taylor observed Frazier as he followed the men and talked to them about what had happened.  See Memorandum in Support of Motion ¶ 4, at 2 (setting forth this fact);  Taylor Statement ¶¶ 3-9, at 1; Taylor Interview ¶ 4, at 4-5; Response at 5-6 (not disputing this fact).  An employee of Three Rivers Brewery, Briana Kneier, obtained Taylor's attention, and Taylor stopped to talk with her.  See Memorandum in Support of Motion ¶ 5, at 2 (setting forth this fact); Taylor Statement ¶¶ 10-11, at 2; Taylor Interview ¶¶ 6-7, at 5; Response at 6 (not disputing this fact).  When Taylor talked with Kneier, she reported that there was a scuffle in the bar and that one of the brothers punched an employee at the bar, but stated that her information was from other employees and that she did not know who attacked whom.[6]  Kneier stated that someone other than the brother who punched the employee then

---

[5]Taylor asserts that the men to whom Frazier was directing instructions did not obey these instructions.  See Memorandum in Support of Motion ¶ 4, at 2 (setting forth this fact); Taylor Statement ¶¶ 3-9, at 1; Taylor Interview ¶ 4, at 4-5.  D. Tanner disputes this fact, and asserts that D. Tanner and his brother were not attempting to leave the scene against Frazier's orders.  See Response ¶ 4, at 5-6 (setting forth this fact); Affidavit of Myron Tanner ¶¶ 11-12, at 2-3 (executed June 25, 2011), filed June 27, 2011 (Doc. 21-4)("M. Tanner Aff.").  Frazier Dashboard Camera at 24:44:55-45:30.  M. Tanner asserts in his affidavit that he heard Frazier yell "Get over here," in a loud and angry voice, and that he and his brother continued to walk when they saw Frazier engaging a woman at the scene.  M. Tanner Aff. ¶ 11, at 2-3.  M. Tanner further asserts that, when Frazier began to yell again and told them to stand by the patrol car, they at that time obeyed his instructions.  See M. Tanner Aff. ¶ 11, at 2-3.  This evidence is sufficiently specific to controvert the asserted fact that they were attempting to leave and not obeying Frazier's instructions.  Frazier's dashboard camera, however, indicates that they were walking away from Frazier and someone immediately afterward said "Let's go" before Frazier yelled at them to stop.  See Frazier Dashboard Camera at 24:44:55-45:30.  Accordingly, the Court will modify the asserted fact to account for those historical facts.

[6]Taylor asserts that Kneier told her that she had fired pepper spray at one of the brothers, because a bartender told the brothers to leave, and that one of the brothers had been involved in a violent interaction with the bartender.  See Memorandum in Support of Motion ¶ 5, at 2; Taylor Statement ¶¶ 10-11, at 2; Taylor Interview ¶¶ 6-7, at 5.  D. Tanner asserts that Kneier "claimed that there was a 'scuffle' in the bar and that one of the brothers punched someone, but stated that her

fired pepper spray.  See Memorandum in Support of Motion ¶ 5, at 1; Taylor Statement ¶¶ 10-11,

at 2; Taylor Interview ¶¶ 6-7, at 5.[7]  While Taylor was speaking with Kneier, Taylor's back was

towards Frazier, but she heard him yelling.  See Memorandum in Support of Motion ¶ 6, at 2; Taylor

Statement ¶¶ 12-13, at 2; Taylor Interview ¶¶ 7-8, at 5-6; Response at 6-7 (not disputing this fact).

During this interview with Kneier, Taylor looked over her shoulder several times in the direction

where Frazier was talking to D. Tanner and his brother.  See Response ¶ 7, at 6-7 (setting forth this

fact); DVD Recording of Officer Misty Taylor's Dashboard Camera at 23:46:28-47:15 (taken March

_____

information was from other employees and she did not know 'who punched who.'"  Response ¶ 5,
at 6.  See Taylor Dashboard Camera at 23:46:45-47:10.  D. Tanner also objects to Kneier's
statements as hearsay.  See Response ¶ 5, at 6.  D. Tanner's description of Kneier's statements more
accurately reflects Kneier's statement on the video, and the Court will modify the asserted fact
accordingly.  See Taylor Dashboard Camera at 23:46:45-47:10.  While these statements would be
hearsay if offered for the truth of the matter asserted, the Court will consider them only for the
nonhearsay purpose of determining the information on which Taylor relied when she took her
actions that night.   United States v. Powell, 164 F.App'x 720, 724 (10th Cir.
2006)(unpublished)("We agree with the District Court that the application is not inadmissible
hearsay because it was not offered for the truth of the matter asserted, but rather to show what
information HUD relied on to approve Ms. Powell's loan.");  United States v. Bowser, 941 F.2d
1019, 1021-22 (10th Cir. 1991)(per curiam)(holding that an officer's testimony that an informant
told him the defendant had a gun and wanted to kill the officer was admissible to explain the
officer's aggressive conduct toward the defendant and was not offered for its truth).   Likewise,
officers are permitted to rely upon hearsay, including multiple levels of hearsay, during an
investigation for Fourth Amendment purposes.  See United States v. Mathis, 357 F.3d 1200, 1206
(10th Cir. 2004)("We therefore conclude that the magistrate's reliance on hearsay information as
a basis for probable cause to support the first search warrant was not in error.");  United States v.
$149,442.43 in U.S. Currency, 965 F.2d 868, 874 n.3 (10th Cir. 1992)("Although this statement is
hearsay, and perhaps multiple hearsay, hearsay may be used to establish probable cause.").

[7]Taylor asserts that Kneier fired pepper spray at one of the brothers.  See Memorandum in
Support of Motion ¶ 5, at 2.  M. Tanner disputes that Kneier fired the pepper spray and relates that
Kneier did not state that she fired pepper spray.  See Response ¶ 5, at 6.  Taylor's dashboard camera
recorded a statement from Kneier that "the other guy" fired pepper spray, but it is not clear to whom
she refers other than that it was likely someone other than the brother who punched the employee
who fired the pepper spray.  Taylor Dashboard Camera at 23:46:45-47:00.  This evidence
specifically controverts the asserted fact that Kneier fired the pepper spray, so the Court will modify
the asserted fact to reflect that Kneier stated that someone other than the brother who punched the
employee who fired the pepper spray.

17, 2011), filed June 27, 2011 (Doc. 34-2)(Ex. 3)("Taylor Dashboard Camera").[8]  During the interview, Taylor could hear Frazier's yelling.  See Memorandum in Support of Motion ¶ 6, at 2 (setting forth this fact); Taylor Statement ¶¶ 12-13, at 2; Taylor Interview ¶¶ 7-8, at 5-6; Response at 6-7 (not disputing this fact).  While Taylor was interviewing Kneier, Frazier dragged D. Tanner to the police vehicle and slammed him on the hood of the vehicle, and began to beat him shortly afterwards.  See Response ¶ 7, at 6-7 (setting forth this fact); DVD Recording of Officer Dale Frazier's Dashboard Camera at 23:46:55-47:30 (taken March 17, 2011), filed June 27, 2011 (Doc. 34-1)(Ex. 2)("Frazier Dashboard Camera"); Reply at 2-3 (not disputing this fact).  Before Taylor walked over to the vehicle, she was standing approximately twenty feet away.  See Response ¶ 7, at 7 (setting forth this fact); Taylor Dashboard Camera at 23:46:28-47:15; Reply at 2-3 (not disputing this fact).

Once she turned towards Frazier and saw D. Tanner on the hood of Frazier's vehicle, Taylor had an unobstructed view of the struggle between Frazier and D. Tanner, including Frazier pushing his flashlight against D. Tanner's throat -- which lasted for approximately ten seconds before Frazier removed the flashlight from D. Tanner's throat.  See Response ¶ 7, at 6-7; Frazier Dashboard Camera at 23:46:55-47:30; Reply at 2-3 (not disputing this fact).  Taylor then observed both Frazier

_____

[8]D. Tanner asserts that "Defendant Taylor's recording shows her looking away from Ms. Kneier at the area where Defendant Frazier was talking to the brothers several times before starting to walk over" in that direction.  Response ¶ 7, at 6-7.  Taylor disputes the manner in which D. Tanner characterizes the way she was looking at the events transpiring between Frazier and the men near the vehicle.  See Reply at 3.  She argues that the evidence supports a conclusion only that she looked over her shoulder several times as opposed to directing the majority of her attention to the events transpiring between Frazier and the men near the vehicle.  See Reply at 3.  After consulting the Taylor Dashboard Camera, the Court agrees that the video supports the conclusion that Taylor looked over her shoulder several times in Frazier's direction as opposed to fully turning her attention to Frazier when she looked in that direction -- at least until Taylor heard Frazier hit D. Tanner against the hood of the car.  See Taylor Dashboard Camera at 23:46:28-47:15; Frazier Dashboard Camera at 23:46:28-47:15.

and D. Tanner holding Frazier's flashlight.  See Memorandum in Support of Motion ¶ 6, at 2-3

(setting forth this fact); Taylor Statement ¶¶ 12-13, at 2; Taylor Interview ¶¶ 7-8, at 5-6; Response

at 6-7 (not disputing this fact).  D. Tanner asserts that he attempted to push the flashlight away from

his throat and larynx, because his airway was blocked and he was unable to breathe.  See Response

¶ 8, at 7 (setting forth this fact); Affidavit of Donovan Tanner ¶¶ 14-15, at 3 (executed June 25,

2011), filed June 27, 2011 (Doc. 21-6)("D. Tanner Aff.");  Reply at 2-3 (not disputing this fact).

Taylor then observed Frazier strike D. Tanner with the flashlight two times in the head, and, as she

got to the vehicle Frazier, was forcing D. Tanner to the ground.  See Memorandum in Support of

Motion ¶ 7, at 3 (setting forth this fact); Taylor Statement ¶ 14, at 2; Taylor Interview ¶ 8, at 5-6;

Response at 7-8 (not disputing this fact).  At that time, Taylor walked past Frazier and placed herself

between Frazier and M. Tanner, who was immediately next to Frazier and D. Tanner.

See Memorandum in Support of Motion ¶ 8, at 3 (setting forth this fact); Taylor Statement ¶ 15, at

2; Taylor Interview ¶ 9, at 6.[9]

     M. Tanner then took off his jacket and threw it on the ground.  See Memorandum in Support

of Motion ¶ 8, at 3 (setting forth this fact); Taylor Statement ¶ 15, at 2; Taylor Interview ¶ 9, at 6;

---

[9]Taylor sets forth the following asserted fact: "At that time, Officer Taylor observed the
second man (Tanner's brother) approaching Deputy Frazier's back.  She walked past Deputy Frazier
and placed herself in between Frazier and Tanner's brother, putting her hand up to stop the advance
of Tanner's brother."  Memorandum in Support of Motion ¶ 8, at 3.  See Taylor Statement ¶ 15, at
2; Taylor Interview ¶ 9, at 6.  D. Tanner disputes that M. Tanner was approaching Frazier, relying
on Frazier's dashboard camera, but concedes that "Myron was standing near Defendant Frazier"
when the event happened.  Memorandum in Support of Motion ¶ 9, at 7-8; Frazier Dashboard
Camera at 23:46:55-47:30.  Drawing all reasonable inferences in D. Tanner's favor, Frazier's
dashboard camera indicates that M. Tanner was not approaching Frazier once Frazier began to beat
D. Tanner.  See Frazier Dashboard Camera at 23:46:55-47:30.  The video footage indicates that M.
Tanner was standing immediately next to Frazier and D. Tanner at the time of the beating.  See
Frazier Dashboard Camera at 23:46:55-47:30.  The Court will modify Taylor's asserted fact to
reflect that M. Tanner was not approaching Frazier, but will also modify the fact to reflect that M.
Tanner was standing immediately next to Frazier and D. Tanner.

Response at 7-8 (not disputing this fact).  M. Tanner's action in taking off his coat was a reaction

to the beating that his brother was taking and was intended to divert Frazier's attention away from

his brother.  See Response ¶ 10, at 8 (setting forth this fact); Affidavit of Myron Tanner ¶¶ 11-12,

at 2-3 (executed June 25, 2011), filed June 27, 2011 (Doc. 21-4)("M. Tanner Aff.").[10]  M. Tanner

at no point in time touched Frazier.  See Response ¶ 9, at 7.  M. Tanner was not standing in a

fighting position while Taylor was standing between him and Frazier.[11]  Taylor drew her pepper

spray and ordered M. Tanner to get back, an order which M. Tanner obeyed.  See Memorandum in

Support of Motion ¶ 10, at 3 (setting forth this fact); Taylor Statement ¶ 16, at 2; Taylor Interview

¶ 9, at 6; Response at 7-8 (not disputing this fact).  A woman wearing a white t-shirt ran toward

---

[10]Taylor disputes the statements in M. Tanner's affidavit as "self-serving" and "conclusory." Reply at 2.  She cites no authority to support these contentions.  A court cannot normally resolve credibility issues on a motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Only when the record blatantly contradicts an affiant's assertions can a court disregard an affiant's statements for summary judgment purposes.  See York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008).  There is no evidence, such as incontrovertible video footage, blatantly contradicting these assertions.  Many of these final events took place off camera, so there is no video footage revealing what occurred.  Ultimately, whether the Court finds the affidavit sufficient to support this asserted fact will likely be a moot point, because a Court cannot properly consider, in the Fourth Amendment context, a suspect's subjective intentions.  See Reeves v. Churchich, 484 F.3d 1244, 1253 (10th Cir. 2007)("Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, the Reeves' subjective motives behind their failure to submit are irrelevant.").

[11]Taylor asserts that, while she was standing between Frazier and M. Tanner, M. Tanner "had closed fists and locked arms, and was standing in a fighting stance."  Memorandum in Support of Motion ¶ 9, at 3 (setting forth this fact).  See Taylor Statement ¶ 15, at 2; Taylor Interview ¶ 9, at 6.  D. Tanner relies on an affidavit from Sophia Descheeny, one of D. Tanner's friends, to controvert this fact.  See Response ¶ 9, at 7-8.  Descheeny states that "[n]one of us were threatening Officer Taylor or Deputy Frazier," and that they "were just standing back and begging them to leave Donovan alone."  Affidavit of Sophia Descheeny ¶ 23, at 3-4 (executed June 25, 2011), filed June 27, 2011 (Doc. 21-7)("Descheeny Aff.").  Drawing all reasonable inferences and resolving all doubts in D. Tanner's favor, this evidence is sufficient to specifically controvert the asserted fact.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).

Taylor, saying that she was D. Tanner's sister; Taylor told the woman to stay back.  See Memorandum in Support of Motion ¶ 11, at 3 (setting forth this fact); Taylor Statement ¶ 17, at 2; Taylor Interview ¶ 10, at 6; Response at 7-9 (not disputing this fact).  M. Tanner remained agitated and wanted to assist D. Tanner.  See Memorandum in Support of Motion ¶ 12, at 3 (setting forth this fact); Taylor Interview ¶ 10, at 6; Response at 7-9 (not disputing this fact).

Immediately after Frazier took D. Tanner to the ground, Frazier beat D. Tanner several times with the flashlight; after having D. Tanner on the ground for approximately twenty seconds, Frazier handcuffed D. Tanner.  See Response ¶ 11, at 8 (setting forth this fact); Frazier Dashboard Camera at 23:47:15-47:55; Reply at 2-3 (not disputing this fact).[12]  While Frazier is hitting D. Tanner on the ground, Frazier instructs D. Tanner to roll over on his stomach and then repeats the word stomach several more times.  See Frazier Dashboard Camera at 23:47:15-47:55.  D. Tanner screamed loudly while Frazier had him on the ground.  See Response ¶ 11, at 8 (setting forth this fact); Frazier Dashboard Camera at 23:47:15-48:00; Reply at 2-3 (not disputing this fact).  Taylor heard the screams while she was near M. Tanner.  See Response ¶ 11, at 8 (setting forth this fact); Frazier Dashboard Camera at 23:47:15-48:00; Reply at 2-3 (not disputing this fact).  Frazier finished handcuffing D. Tanner approximately one minute after initially bringing D. Tanner to the ground.  See Frazier Dashboard Camera at 23:47:15-48:45.  The amount of time that passed from the time Frazier slammed D. Tanner on the hood of the vehicle until Frazier began handcuffing D. Tanner was approximately forty-five seconds.  See Frazier Dashboard Camera at 23:47:05-47:50.

_____

[12]Frazier's dashboard camera demonstrates that Frazier hit D. Tanner at least three and likely more times with his flashlight while D. Tanner was on the ground.  See Frazier Dashboard Camera at 23:47:15-47:45.  After having D. Tanner on the ground for approximately twenty seconds, Frazier pulls out his handcuffs and places them on D. Tanner -- a fact which the video footage confirms when Frazier pulls up D. Tanner into full view of the camera and D. Tanner is in handcuffs.  See Frazier Dashboard Camera at 23:47:30-48:50.

San Juan County Sheriff's Deputy McCoy arrived, and he and Taylor handcuffed M. Tanner. See Memorandum in Support of Motion ¶ 13, at 3 (setting forth this fact); Taylor Statement ¶¶ 18-19, at 2; Taylor Interview ¶ 11, at 7; Response at 9 (not disputing this fact). Taylor looked back in Frazier's direction several times before McCoy arrived and before Frazier had fully handcuffed D. Tanner. See Response ¶ 11, at 8 (setting forth this fact); Descheeny Aff. ¶ 8-12, 14, 21 at 2-3.[13] When McCoy moved over to Frazier's vehicle, where D. Tanner was in handcuffs, D. Tanner was banging his head against the hood of the vehicle; McCoy then placed his hands around D. Tanner's head and neck for approximately three seconds in a choking manner. See Response ¶ 12, at 9; Frazier Dashboard Camera at 23:48:45-49:15.[14] Taylor was not involved in D. Tanner's arrest or handcuffing. See Memorandum in Support of Motion ¶ 15, at 4 (setting forth this fact); Taylor Interview ¶ 11, at 7; Response at 9 (not disputing this fact). Taylor did not take any actions to stop McCoy when he had his hands around D. Tanner in a choking manner. See Response ¶ 12, at 9 (setting forth this fact); Frazier Dashboard Camera at 23:48:45-49:15; Reply at 2-3 (not disputing

_____

[13]Taylor asserts that she was not able to look back at Frazier until after McCoy arrived and D. Tanner was already handcuffed in front of Frazier's vehicle. See Memorandum in Support of Motion ¶ 14, at 3 (setting forth this fact); Taylor Interview ¶¶ 10-11, at 6-7. D. Tanner relies on Descheeny's affidavit to dispute this fact. See Descheeny Aff. ¶ 8-12, 14, 21 at 2-3. Descheeny states that she saw Taylor look back in Frazier's direction several times while he was arresting D. Tanner. See Descheeny Aff. ¶ 8-12, 14, 21 at 2-3. This evidence is sufficient to specifically controvert Taylor's asserted fact.

[14]D. Tanner asserts that, when McCoy arrived at Frazier's vehicle, he began to choke D. Tanner. See Response ¶ 12, at 9. Under rule 56(c)(1) of the Federal Rules of Civil Procedure, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of material in the record." Fed. R. Civ. P. 56(c)(1). The portion of Frazier's dashboard camera, when drawing all reasonable inferences in D. Tanner's favor, supports the asserted fact that McCoy choked D. Tanner. See Frazier Dashboard Camera at 23:48:45-49:15. The Court will modify the asserted fact to reflect the context of the incident as seen on Frazier's dashboard camera, specifically that D. Tanner was banging his head on the vehicle before McCoy acted in this manner and that McCoy had his hands around D. Tanner for approximately three seconds. See Frazier Dashboard Camera at 23:48:45-49:15.

this fact).

"The entire amount of time between Officer Taylor's arrival at the scene and Deputy McCoy's arrival at the scene was, at most, 3 minutes and 38 seconds."  Memorandum in Support of Motion ¶ 16, at 4 (setting forth this fact).  See Internal Affairs Report at 8, 11 (not dated), filed June 6, 2011 (Doc. 17-2); Response at 9 (not disputing this fact).  Captain Tim Black, in a report for internal affairs, noted that Frazier's use of a flashlight on D. Tanner's neck could have caused "serious injury" and that the head area is an "Avoid Zone in police baton training."  Response ¶ 13, at 9 (setting forth this fact).  See Complaint Investigation Report at 6 (dated March 17, 2011), filed June 27, 2011 (Doc. 21-5); Reply at 2-3 (not disputing this fact).  The Farmington Police Academy trains officers that, when more than one officer is present, one is the "contact officer" and the other is the "cover officer."  Memorandum in Support of Motion ¶ 17, at 4 (setting forth this fact).  See Officer Positioning, Contact and Cover at 2-3, filed June 6, 2011 (Doc. 17-3); Reply at 2-3 (not disputing this fact).  The cover officer is supposed to position himself or herself to the side of the contact officer to maintain surveillance on all subjects.  See Memorandum in Support of Motion ¶ 17, at 4 (setting forth this fact); Officer Positioning, Contact and Cover at 2-3; Response at 9-10 (not disputing this fact).  In her role as a cover officer, Taylor was supposed to ensure the safety of the contact officer -- Frazier.  See Memorandum in Support of Motion ¶ 18, at 4 (setting forth this fact); Internal Affairs Report at 15; Response at 9-10 (not disputing this fact).[15]  The Internal Affairs

---

[15]D. Tanner asserts that, under the circumstances presented to Taylor, an objective observer "would conclude that the use of the flashlight by Defendant Frazier to strangle and beat Plaintiff Tanner, considering the minimal or lack of resistance by Plaintiff Tanner, was excessive and endangered Plaintiff Tanner," and that "a reasonable police officer would recognize a duty to prevent the immediate harm that superseded any duty to protect from interference by bystanders." Response ¶ 14, at 9.  The Court considers these to be legal arguments as opposed to factual assertions and will consider them as such when it resolves the issues that the Motion raises.  See Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)(Nottingham,

Report generated in response to the current lawsuit resulted in a finding of proper conduct on Taylor's part. See Memorandum in Support of Motion ¶ 19, at 4 (setting forth this fact); Internal Affairs Report at 15.[16]

## PROCEDURAL BACKGROUND

D. Tanner filed his original complaint on April 21, 2011, asserting several causes of action against Taylor. See Complaint for Damages for Deprivation of Civil Rights Under 42 U.S.C. § 1983, Excessive Force, Malicious Abuse of Process, False Arrest and Imprisonment, Assault and Battery, and Prima Facie Tort at 8-10, 14, filed April 15, 2010 (Doc. 1). D. Tanner amended his pleadings on April 28, 2011, but did not assert any additional claims against Taylor as a result of this amendment. See First Amended Complaint for Damages for Deprivation of Civil Rights Under 42 U.S.C. § 1983, Excessive Force, Malicious Abuse of Process, False Arrest and Imprisonment, Assault and Battery, and Prima Facie Tort at 9-12, 15-16 (Doc. 5)("Amended Complaint"). He asserts two Counts against Taylor: (i) Count I: deprivation of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; and (ii) Count VI: prima-facie tort under the New Mexico Tort Claims Act ("NMTCA"), N.M.S.A. 1978, §§ 41-4-1 to -30.

---

J.)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute. Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).

[16]D. Tanner argues that the conclusions in this Internal Affairs Report are not relevant. See Response ¶ 15, at 10. To the extent the conclusions in this Internal Affairs Report are not relevant under rules 401 and 402 of the Federal Rules of Evidence, the Court will not consider those conclusions. See Fed. R. Evid. 401-02; Ruiz v. City of Brush, 2006 WL 1816454, at *4 ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute. Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)). To the extent the conclusions are relevant, the Court does not find it necessary to consider the conclusion in this Internal Affairs Report about whether Taylor acted properly to resolve this Motion. Thus, the Court does not place any weight on the ultimate conclusions in the Internal Affairs Report.

See Amended Complaint at 9-12, 15-16.  The allegations against Taylor in Count I are as follows:

> Defendant Taylor had a duty to intervene when she arrived at the scene where the Plaintiffs were being unlawfully and unreasonably detained because they were Native Americans, and where there was no reasonable suspicion that they had been involved in the commission of a crime, and she breached that duty by permitting Defendant Frazier to detain and arrest the Plaintiff, thereby depriving the Plaintiff of his rights under Amendments IV and XIV of the Constitution of the United States.

> In fact, Misty Taylor was an accessory to Frazier's criminal actions by promoting the actions and suggesting Plaintiff could be charged with disarming a police officer, a charge that was totally fabricated and unfounded under the law and facts of this case.

> Defendant Taylor was situated where she had an opportunity to intervene, and had a duty to intervene and protect the Plaintiff, when she observed Defendant Frazier beating, strangling and torturing Donovan Tanner, and Defendant McCoy choking and strangling the Plaintiff, and failed to do so, thereby depriving the Plaintiff of his rights under Amendments IV, V, VIII and XIV of the Constitution of the United States.

Amended Complaint ¶¶ 65-67, at 10.  The allegations against Taylor in Count VI are as follows: "The Defendant law enforcement officers acted in an intentional, depraved and outrageous manner as described herein, and their actions shock the conscience.  The Plaintiff was injured and wronged by the intentional and shocking acts of the Defendants and is entitled to damages."  Amended Complaint ¶¶ 83-84, at 16.

On June 6, 2011, Taylor filed her Motion seeking summary judgment.  She argues that she is entitled to summary judgment on Count I on the basis of qualified immunity and Count VI on the basis of sovereign immunity.  See Memorandum in Support of Motion at 1-2.  Taylor acknowledges that the United States Court of Appeals for the Tenth Circuit has recognized that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  Memorandum in Support of Motion at 5 (quoting Hall v. Burke, 12 F.App'x 856, 861 (10th Cir. 2001)(unpublished)).

-14-

She argues that, as a cover officer, she can be held liable for failing to intervene in only three circumstances: if she observed or had reason to know that (i) excessive force was being used; (ii) a citizen was unjustifiably arrested; or (iii) a law enforcement individual had committed any constitutional violation.  See Memorandum in Support of Motion at 6.  She emphasizes that a cover officer may be held liable only if the cover officer had a "realistic opportunity to intervene to prevent the harm from occurring," including when the officer does not have sufficient time to intervene or would be unable to prevent the harm the other officer causes.  Memorandum in Support of Motion at 6 (quoting Hall v. Burke, 12 F.App'x at 861).  She contends that, under the facts presented, she cannot be held liable.  See Memorandum in Support of Motion at 6-7.  Taylor asserts that, in light of the circumstances and the facts presented to Taylor, including that D. Tanner was wrestling for control of the flashlight with Frazier, she did not observe or have reason to know that Frazier or McCoy were using excessive force.  See Memorandum in Support of Motion at 6-8.  She argues that she was fully occupied in dealing with M. Tanner and, thus, had no opportunity to intervene, even if she had the obligation to do so.  See Memorandum in Support of Motion at 8-11.  She also asserts that the facts in this case presented exigent circumstances, which she contends justify her conduct under the circumstances.  See Memorandum in Support of Motion at 10-11.  Taylor argues that the Farmington police training materials regarding how cover officers should conduct themselves supports her argument that she acted reasonably under the circumstances.  See Memorandum in Support of Motion at 11-12.

Taylor asserts that, even if her conduct was mistaken, her mistake was reasonable.  See Memorandum in Support of Motion at 12.  She contends that this reasonable mistake supports summary judgment on the grounds that she did not violate any clearly established law.  See Memorandum in Support of Motion at 12.  Lastly, she argues that New Mexico has not waived

sovereign immunity for the conduct D. Tanner bases his NMTCA cause of action.  See Memorandum in Support of Motion at 12-14.  She also argues that her conduct was reasonable and that she lacked any intent to injure D. Tanner.  See Memorandum in Support of Motion at 14.

On June 27, 2011, D. Tanner filed his Response to the Motion seeking summary judgment. D. Tanner asserts that the force Frazier used was excessive.  See Response at 14-15.  He contends that Frazier's use of force was not objectively reasonable under the circumstances.  See Response at 14-15.  He argues that "Defendant Taylor was placed upon immediate notice that something was wrong with Defendant Frazier when she drove up and saw and heard his actions and yelling." Response at 15.  He contends that she had an opportunity to intervene, because she observed Frazier's behavior and knew that "beating a person on the head was dangerous and forbidden." Response at 16.  He asserts that "Defendant Taylor, who was within a few feet of Defendant Frazier during the incident, undoubtedly saw that Defendant Frazier had lost control yet she failed to restrain him and watched his back while he administered a beating on a helpless citizen."  Response at 17. He argues that "[a] reasonable juror could conclude that [a reasonable officer in Taylor's position] would have checked on Defendant Frazier because of the shouts and the loud and distinctive screams from behind her."  Response at 18.  He contends that no exigent circumstances were present, because "[a]ny exigency was created by Defendant Frazier," who "was not in control of his emotions."  Response at 18-19.  He argues that, by the time Frazier's attack on D. Tanner took place, the crowd had dissipated, and that M. Tanner and Descheeny were the only people remaining at the scene.  See Response at 19.  D. Tanner contends that Descheeny "was obviously no threat to the officers, and any claim that she presented a danger is false."  Response at 20.  He asserts that he has established a violation of a constitutional right and that this violation is clearly established.  See Motion at 22-23.  He argues that, based on the Internal Affairs Report, "the prohibition against the

use of a baton (or flashlight) to strike persons on the head and the danger of using choke holds and blocking a person's airway appears to be well-known in the law enforcement community." Response at 22.

On June 27, 2011, D. Tanner and Taylor filed a joint motion dismissing Count VI, in the Amended Complaint, asserted against Taylor.  See Joint Motion to Dismiss Count VI Prima Facie Tort Claim Against Defendant Misty Taylor (Doc. 23).  On July 11, 2011, Taylor filed her Reply. She contends that D. Tanner improperly relies on facts that were not known to Taylor that occurred before she arrived on the scene.  See Reply at 4-5.  She argues that courts cannot judge her conduct "with the luxury of 20/20 hindsight." Reply at 5.  She asserts that a realistic opportunity to intervene exists when an officer "could have 'called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop.'"  Reply at 8 (alteration in original)(quoting Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005)).  She argues that the blows occurred in such rapid succession that she could not have intervened.  See Reply at 8-9.

At the hearing on February 16, 2012, Taylor emphasized that D. Tanner cannot establish that a reasonable officer knew or should have known that Frazier and McCoy were using excessive force. See Transcript of Hearing at 7:21-8:2 (taken February 16, 2012)(Mann)("Tr.").[17]  Taylor argued that M. Tanner's proximity to Frazier made the situation one where exigent circumstances existed, because M. Tanner was a threat to officer safety.  See Tr. at 8:21-24 (Mann).  The Court asked what impact the existence of exigent circumstances would have on the resolution of the issues raised in the Motion.  See Tr. at 8:25-9:1 (Court).  Taylor responded that the existence of exigent circumstances relaxes the normal standards for determining whether force was excessive, and cited

_____

[17]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

United States v. Anderson, 154 F.3d 1225 (10th Cir. 1998), and Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colo., 469 F.3d 957 (10th Cir. 2006), for this proposition.  See Tr. at 9:2-12 (Mann, Court).  Taylor also referred to the Court's opinion in Montoya v. City of Albuquerque, No. 03-0261, 2004 WL 3426436 (D.N.M. May 10, 2004)(Browning, J.), for the proposition that Taylor must also have had the opportunity to intervene to hold her liable for failing to intervene.  See Tr. at 9:21-10:3 (Mann).  The Court asked at what point in time Taylor said "whoa" on the video recording.  Tr. at 10:16 (Court).  Taylor said that she said "whoa" when she observed Frazier and Taylor wrestling on the hood of the vehicle.  See Tr. at 10:17-11:14 (Mann).  She emphasized that many of these events took place over a particularly short period of time such that she would not have had an opportunity to intervene, assuming she had an obligation to do so.  See Tr. at 10:17-11:22 (Mann).  Taylor noted that she is not particularly large and would have had a difficult time intervening in the altercation between Frazier and D. Tanner.  See Tr. at 12:18-13:8 (Mann).  Taylor stated that the metal sound of D. Tanner hitting the hood of Frazier's vehicle caused her to turn around.  See Tr. at 14:2-7 (Court, Taylor).

D. Tanner first asserted that Taylor should have intervened and stopped Frazier's conduct as soon as she approached Frazier's vehicle.  See Tr. at 20:4-14 (Stoker).  D. Tanner then clarified that he did not expect Taylor to intervene until Frazier had struck him with the flashlight in the head. See Tr. at 22:24-23:14 (Court, Stoker).  When posed with a hypothetical of how an officer should respond when thirty people in a crowd are rushing an officer who is acting improperly, D. Tanner conceded that a reasonable officer would focus on controlling the crowd in those circumstances as opposed to intervening in the officer's conduct.  See Tr. at 23:15-24 (Court, Stoker).  D. Tanner asserted that he believes that it is a question of fact whether Taylor should have intervened in the altercation between D. Tanner and Frazier rather than focus on M. Tanner.  See Tr. at 30:13-20

-18-

(Court).  Taylor argued that there is not clearly established law how an officer should react under these factual circumstances.  See Tr. at 32:20-33:10 (Mann).  Additionally, she contended that no constitutional violation occurred, because the force would not have appeared excessive to her under the circumstances.  See Tr. at 33:13-34:7 (Mann).  Taylor emphasized that she acted according to her training.  See Tr. at 35:6-16 (Mann).  She asserted that she could not have known exactly what provoked the altercation between D. Tanner and Frazier to allow her to evaluate whether the force Frazier used was excessive.  See Tr. at 37:1-19 (Mann).  She emphasized that, assuming the force was excessive, she faced a Hobson's choice[18] in turning her back to M. Tanner to intervene in Frazier's conduct -- endangering her own and Frazier's safety -- or in monitoring M. Tanner to protect the officers' safety.  See Tr. at 39:19-40:12 (Mann, Court).  Taylor contended that no evidence supports D. Tanner's contention that she was involved in any injuries that resulted from the officers placing D. Tanner in the vehicle.  See Tr. at 43:3-10 (Court, Mann).  She also argued that a reasonable officer would be more hesitant to intervene when the officer engaging in allegedly questionable conduct is from a different law enforcement agency.  See Tr. at 45:14-46:2 (Mann).  Taylor also noted that there was a relative size difference between herself and the other two officers, making it more difficult for her to intervene.  See Tr. at 46:3-8 (Mann).  As to Count VI involving the prima-facie tort under New Mexico law, D. Tanner represented that an order dismissing that Count had already been entered.  See Tr. at 47:3-12 (Court, Stoker, Mann).

### LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[18]A Hobson's choice is "a choice of taking what is available or nothing at all."  New Oxford American Dictionary 826 (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010).

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial

burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."

Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation

marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets

this burden, rule 56 requires the non-moving party to designate specific facts showing that there is

a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986).

       The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof." (internal

quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . . citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a

properly supported motion for summary judgment to "rest on mere allegations or denials of his [or

her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of

Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th

Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in his complaint, but must respond with specific facts

showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates

to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. 194,

205 (2001).  When a defendant asserts qualified immunity at summary judgment, the responsibility

shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128

(10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions

violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at

the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir.

2009).

### 1.   Procedural Approach to Qualified Immunity.

The Supreme Court of the United States recently revisited the proper procedure for lower

courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held

that lower courts "should be permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer

mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See Pearson v. Callahan

555 U.S. at 241.  In rejecting a mandatory approach, the Supreme Court recognized that "[t]here are

cases in which it is plain that a constitutional right is not clearly established but far from obvious

whether in fact there is such a right," and that such an approach burdens district court and courts of

appeals with "what may seem to be an essentially academic exercise."  Pearson v. Callahan, 555

U.S. at 237.  The Supreme Court also recognized that a mandatory approach "departs from the

general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to

pass on questions of constitutionality unless such adjudication is unavoidable." Pearson v. Callahan,

555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  Once the plaintiff has

established the inference that the defendant's conduct violated a clearly established constitutional

right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d

867, 870-71 (10th Cir. 1993).

The Supreme Court recognized seven circumstances where district courts should proceed

directly to and "should address only" the clearly established prong of the qualified immunity

analysis:

> [W]hen (1) the first, constitutional violation question "is so factbound that the
> decision provides little guidance for future cases"; (2) "it appears that the question
> will soon be decided by a higher court"; (3) deciding the constitutional question
> requires "an uncertain interpretation of state law"; (4) "qualified immunity is
> asserted at the pleading stage" and "the precise factual basis for
> the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create
> a risk of bad decisionmaking" due to inadequate briefing; (6) discussing both
> elements risks "bad decisionmaking" because the court is firmly convinced the law
> is not clearly established and is thus inclined to give little thought to the existence
> of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests
> the wisdom of passing on the first constitutional question because "it is plain that a
> constitutional right is not clearly established but far from obvious whether in fact
> there is such a right."

Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at

236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that

courts may "avoid avoidance" and address the first prong before the second prong in cases involving

a recurring fact pattern where guidance on the constitutionality of the challenged conduct is

necessary and the conduct is only likely to face challenges in the qualified immunity context.

Camreta v. Greene, 131 S.Ct. 2020, 2031-32 & n.5 (2011).  See Kerns v. Bader, 663 F.3d at 1181.

"In general, courts should think hard, and then think hard again, before turning small cases into large

ones."  Camreta v. Greene, 131 S.Ct. at 2032.  Accord Kerns v. Bader, 663 F.3d at 1181.  The

Supreme Court has also recently emphasized in the qualified immunity context: "Courts should

think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions

of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"

Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011).  The Tenth Circuit will normally remand a case to the district court for further consideration when the district court has given cursory treatment to the qualified immunity issue.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether a right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' a court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298

(10th Cir. 2004).

The Supreme Court further clarified what a plaintiff must show to satisfy the clearly established requirement in Ashcroft v. al-Kidd.  The Supreme Court held that, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S.Ct. at 2083.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S.Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.  The Tenth Circuit, in Kerns v. Bader, focused on the Supreme Court's language in Ashcroft v. al-Kidd in its analysis of qualified immunity.  In that case, which dealt with a search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183 (emphasis added).  The Tenth Circuit reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "might make a constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  In Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007), the Tenth Circuit re-emphasized

-26-

its sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." 509 F.3d at 1284 (citing Pierce v. Gilchrist, 359 F.3d at 1298). Thus, "when an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### 3.   Factual Disputes in the Qualified-Immunity Analysis.

In determining whether the plaintiff has met his or her burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party. See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v. Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them"). In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312. "The Tenth Circuit, in Rhoads v. Miller, explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," <u>id.</u> at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," <u>id.</u> at 380. In <u>Scott</u>, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistence or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under <u>Graham v. Connor</u>, 490 U.S. 386, 395-96 (1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 F.App'x 289, 291-92 (10th Cir. 2009)(unpublished)(internal quotation marks omitted). <u>See</u> <u>Lymon v. Aramark Corp.</u>, 728 F.Supp.2d at 1249-50 (quoting <u>Rhoads v. Miller</u>, 352 F.App'x at 291-92). In a concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J. concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts")).

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters;

(ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business,"  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

### 1.      Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229

(10th Cir. 2001)(en banc).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  This standard is met by information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134.  A police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

In United States v. Ceballos, 355 F.App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F.App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl continued on her walk.  See 355 F.App'x at 227-28.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F.App'x at 227-28.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F.App'x at 227-28.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F.App'x at 227-28.  Upon talking to Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F.App'x at 227-29.  The Tenth Circuit found that the facts available to the officer

-30-

would have led a reasonable officer to conclude that reasonable suspicion existed, and that the officer's "subjective characterization of his actions is irrelevant." 355 F.App'x at 227-29. The Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F.App'x at 228-30. The Tenth Circuit did not require the officer to identify the particular crime for which he had reasonable suspicion, or even to acknowledge that he had reasonable suspicion. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F.App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F.App'x at 229.

**2.    Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may

-31-

nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive

or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v.

Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms,

handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been

placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).

See Florida v. Royer, 460 U.S. 491, 499 (1983).  Inasmuch as an arrest exceeds an investigative

stop's limited scope or duration, it must be supported by probable cause.

## LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is

required to show that the force used was impermissible (a constitutional violation) and that

objectively reasonable officers could not have thought the force constitutionally permissible

(violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

Accord Mata v. City of Farmington, 791 F.Supp.2d 1118, 1137-38 (D.N.M. 2011)(Browning, J.).

An excessive force claim "must . . . be judged by reference to the specific constitutional standard

which governs that right, rather than to some generalized 'excessive force' standard."  Graham v.

Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the

context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness

standard.  See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have

used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other

'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

standard . . . .").  The Supreme Court recognizes that "police officers are often forced to make

split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about

the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. at 397.

Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205. When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

### 1. Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable. In Estate of Larsen ex. rel Sturdivan v. Murr, the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors. These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260. In Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted). A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted). Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.

## 2.    Least- or Less-forceful Alternatives in Excessive-Force Cases.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor."  James v. Chavez, No. 09-0540, 2011 WL 5822726, at *17 (D.N.M. Nov. 9, 2011)(Browning, J.).  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under

Terry v. Ohio of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's

contention that the arresting officers were "obligated to use the least intrusive means available to

dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme

Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the

availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's

ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second

guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).

Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always
> imagine some alternative means by which the objectives of police might have been
> accomplished.  But "[t]he fact that the protection of the public might, in the abstract,
> have been accomplished by less intrusive means does not, by itself, render the search
> unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit

disagreed with the plaintiff's contention that expert testimony about when a police dog's use is

objectively reasonable and about how defendant Lehocky's actions violated "well established law

enforcement standards . . . should have been admitted since it would have been helpful to the jury

in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so

holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not
> require [police] to use the least intrusive means in the course of a detention, only
> reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.
> 1994).  Similarly, "violations of state law and police procedure generally do not give
> rise to a [42 U.S.C. §] 1983 claim" for excessive force.  Romero v. Bd. of County
> Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d
> 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation
> is insufficient for liability under section 1983" for excessive force).  Both of these
> principles of our Fourth Amendment jurisprudence stem from the proper perspective

from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir. 2002)].  Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions."   [United States v.] Melendez-Garcia, 28 F.3d at 1052.

Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez.  In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related.  This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably.  [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty. Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones."  28 F.3d at 1052 (internal quotations omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .

-36-

Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner and Graham v. Connor.").

        "Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F.Supp.2d 1284, 1296 (D.N.M. 2010)(Browning, J.).  See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  See also Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F.Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983). The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31,

2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## LAW REGARDING DUTY TO INTERVENE TO STOP
## A CONSTITUTIONAL VIOLATION

"An officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation of protected rights." Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984), judgement vacated on other grounds by City of Lawton, Okla. v. Lusby, 474 U.S. 805 (1985). In Hall v. Burke, 12 F.App'x 856 (10th Cir. 2001), the Tenth Circuit made clear that an officer's duty to intervene applies to instances involving excessive force and illegal arrests. See 12 F.App'x at 861. The Tenth Circuit in Hall v. Burke stated:

> [W]e agree . . . that it is clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

12 F.App'x at 861 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1996)). Accord Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)(quoting almost identical language from a decision from the United States Court of Appeals for the Second Circuit); Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)("[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983."); Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433 (ruling that officer who did not prevent fellow officer's use of allegedly excessive force against an arrestee "may be liable [under § 1983] if he had the opportunity

to intervene but failed to do so").  An officer thus may be liable if he had the opportunity to prevent

or stop a constitutional violation but failed to do so.  See Lusby v. T.G. & Y. Stores, Inc., 749 F.2d

at 1433.  Accord Mata v. City of Farmington, 791 F.Supp.2d at 1156.

## ANALYSIS

The Court concludes that Taylor had no obligation to intervene in the investigatory detention

and subsequent arrest that Frazier conducted, because a reasonable officer in her position would

have believed that Frazier had both reasonable suspicion and probable cause that D. Tanner had

committed several offenses.  Based on the information available to Taylor, the level of force Frazier

used, and the surrounding circumstances of the incident, Frazier's conduct never triggered a duty

for Taylor to intervene in the context of D. Tanner's excessive force claim.  In light of the minimal

amount of force McCoy used and the surrounding circumstances of the incident, Taylor had no

reason to believe that McCoy used excessive force.  Assuming that some of Frazier's conduct

triggered a duty for Taylor to intervene, she did not violate any clearly established law by failing

to intervene.  Assuming that Frazier's conduct triggered a duty to intervene, Taylor had no realistic

opportunity to intervene, because she was occupied with M. Tanner.  Finally, assuming that

McCoy's conduct triggered a duty to intervene, that his conduct lasted for approximately three

seconds prevented Taylor from having a realistic opportunity to intervene.

I.     **TAYLOR DID NOT OBSERVE OR HAVE REASON TO KNOW THAT FRAZIER DETAINED OR ARRESTED D. TANNER WITHOUT REASONABLE SUSPICION OR PROBABLE CAUSE.**

D. Tanner alleges as part of Count I:

> Defendant Taylor had a duty to intervene when she arrived at the scene where the Plaintiffs were being unlawfully and unreasonably detained because they were Native Americans, and where there was no reasonable suspicion that they had been involved in the commission of a crime, and she breached that duty by permitting Defendant Frazier to detain and arrest the Plaintiff, thereby depriving the Plaintiff

of his rights under Amendments IV and XIV of the Constitution of the United States.

Amended Complaint ¶ 65, at 10.  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107. The facts the parties have set forth indicate that a reasonable officer in Taylor's position would have believed Frazier had reasonable suspicion to detain D. Tanner based on the information she received from Kneier about the assault that occurred in the bar.  An officer, such as Taylor, is also generally not required to second guess another officer's probable cause determination when there is an imbalance of information between the officers.  Even if Frazier's probable cause determination was flawed, Taylor reasonably relied upon it under the circumstances.

The relevant facts are as follows.  Shortly after Taylor arrived at the scene, Kneier obtained Taylor's attention, and Taylor stopped to talk with her.  When Taylor talked with Kneier, Kneier said that there was a scuffle in the bar and that one of the brothers punched an employee at the bar, but stated that her information was from other employees and that she did not know who attacked whom.  Kneier stated that someone other than the brother who punched the employee then fired pepper spray.  While Taylor was speaking with Kneier, Taylor's back was towards Frazier, but she heard him yelling.  During this interview with Kneier, Taylor looked over her shoulder several times in the direction where Frazier was talking to D. Tanner and his brother.  While Taylor was interviewing Kneier, Frazier dragged D. Tanner to the police vehicle and slammed him on the hood of the vehicle and began to beat him shortly afterwards.  Before Taylor walked over to the vehicle, she was standing approximately twenty feet away.  Once she turned towards Frazier and saw D.

Tanner on the hood of Frazier's vehicle, she had an unobstructed view of the struggle, including

Frazier pushing his flashlight against D. Tanner's throat.  Taylor then observed both Frazier and D.

Tanner holding Frazier's flashlight.  D. Tanner asserts that he attempted to push the flashlight away

from his throat and larynx, because his airway was blocked and he was unable to breathe.

Taylor did not have a duty to intervene in Frazier's initial investigatory stop of D. Tanner.

"An officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation

of protected rights."  Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433.  The Tenth Circuit in Hall

v. Burke stated:

> An officer who fails to intercede is liable for the preventable harm caused by the
> actions of the other officers where that officer observes or has reason to know: (1)
> that excessive force is being used, (2) that a citizen has been unjustifiably arrested,
> or (3) that any constitutional violation has been committed by a law enforcement
> official.  In order for liability to attach, there must have been a realistic opportunity
> to intervene to prevent the harm from occurring.

12 F.App'x at 861.

As a preliminary note, none of the parties' asserted facts suggest that Taylor and Frazier had

equal information about the events underlying this case.  It is undisputed that Taylor arrived after

Frazier was on the scene.  It is also undisputed that she was communicating with Kneier while

Frazier was interacting with D. Tanner and M. Tanner.  Looking at the facts in the light most

favorable to D. Tanner based on the applicable video footage, she occasionally looked over her

shoulder while talking to Kneier and thus would have had a general awareness of Frazier's conduct.

The parties have not set forth any asserted facts about how much Frazier knew about the situation --

such as if he had received a report over the radio in his vehicle about a fight at a bar.  No facts

suggest that Taylor had any conversation with Frazier before the struggle between Frazier and D.

Tanner took place.  These facts are significant for purposes of evaluating Taylor's liability.  The test

-41-

the Tenth Circuit has adopted for failure to intervene is as follows: "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer <u>observes</u> or <u>has reason to know</u>: (1) that excessive force is being used [or] (2) that a citizen has been unjustifiably arrested . . . ." <u>Hall v. Burke</u>, 12 F.App'x at 861 (emphasis added).

The Tenth Circuit does not appear to have squarely addressed how liability for failure to intervene operates when the officer who allegedly should have intervened does not necessarily have all the information in the possession of the other officer who allegedly acts unlawfully. Conversely, a situation could arise where the officer who should have allegedly intervened has more information than the officer who allegedly acts unlawfully, which causes the observing officer to not intervene. The Tenth Circuit recently mentioned this issue in passing in a footnote, as part of a case where a secondary officer was at the scene for the entire duration of the allegedly unlawful conduct and who participated in some of the allegedly unlawful conduct, that it would not evaluate the secondary officer's liability differently in part because the secondary officer had not raised this argument. <u>See</u> <u>Weigel v. Broad</u>, 544 F.3d at 1143 n.4 ("Trooper Henderson makes no argument that his liability should be addressed differently than that of Trooper Broad because he was in his car when Mr. Weigel went into cardiac arrest.").

Faced with a situation where the secondary officer had limited information about the other officer's conduct and knowledge, the United States Court of Appeals for the Sixth Circuit concluded that the secondary officer did not know or have reason to know that "excessive force would be or was being used," or have a realistic opportunity to intervene:

> As to the first requirement, the record is devoid of any suggestion that Officer Scott actually observed or should have known of Daly's actions. No evidence indicates that Officers Scott and Daly communicated with one another prior to or between the blows; the testimony of the Turners, indeed, was to the contrary. The Turners also testified that Officer Scott had his back turned to them throughout the

entire affair.

Victor Turner, who was looking right at Mrs. Turner, saw the first bump and thought it was merely accidental.  Jesse Turner, while also looking right at Mrs. Turner, saw her head move but did not notice the shotgun.  Given the state of the record as a whole, no jury could possibly be permitted to find that Officer Scott knew or should have known about the initial impact.

Neither could a jury be permitted to find that Officer Scott knew or should have known that there would be a second blow.  The only permissible conclusion from the record is that Officer Scott was not alerted to any problem until after the blow had been struck.

As to the second requirement, the record provides no basis for thinking that Officer Scott might have had an opportunity to prevent the incident.  If he was entirely unaware of the first impact, he could hardly have prevented the second.  Officer Daly may or may not have intended to strike Mrs. Turner, but there is not a scintilla of evidence linking Officer Scott to the harm.

The district court's speculation about a conspiracy and coverup changes nothing.  Mrs. Turner did not plead a conspiracy, and there is no evidence that one existed.  Officer Daly was just beginning his shift as he walked into the squad room.  The record indicates that Officers Scott and Daly did not talk with each other (or even acknowledge each other) before the incident.  The complaint does not allege that the two communicated in any way, and Mrs. Turner denied in her deposition that any communication occurred.

Turner v. Scott, 119 F.3d 425, 429-30 (6th Cir. 1997).  The United States Court of Appeals for the Eleventh Circuit reached a similar conclusion when plaintiffs failed to show that a secondary officer "could have observed or did observe excessive force," and found that the secondary officer was thus not "in a position to intervene."  Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998).  The Court has located no circuit court authority that has taken a contrary position.

The Court believes the Tenth Circuit would find the Sixth Circuit and Eleventh Circuit's logic persuasive.  First, the Tenth Circuit applies the same basic standard as these circuits, specifically that the secondary officer must observe or have reason to know that the primary officer is engaging in improper conduct.  See Hall v. Burke, 12 F.App'x at 861.  Second, both the Tenth

-43-

Circuit and the Supreme Court have emphasized that an officer can be held liable only for his or her own improper conduct. The Supreme Court stated in Ashcroft v. Iqbal: "Because vicarious liability is inapplicable to <u>Bivens</u>[19] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. 1937, 1948 (2009). The Tenth Circuit has also explained in the analogous context of supervisory liability: "We consequently concluded that [i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation but [p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." <u>Dodds v. Richardson</u>, 614 F.3d 1185, 1195 (10th Cir. 2010). Thus, the Court will follow the principles the Sixth Circuit and Eleventh Circuit have discussed, because it believes these circuit courts' logic is persuasive and that both the Supreme Court and the Tenth Circuit would find that logic persuasive. The Court also finds this logic persuasive, as it seems unfair to hold a secondary officer liable for a primary officer's conduct in a circumstance where the secondary officer has no information available to him or her suggesting that the primary officer acted improperly.

The information available to Taylor would have led a reasonable officer to the conclusion that Frazier had reasonable suspicion to detain D. Tanner for further investigation. She saw D. Tanner and M. Tanner walking away from Frazier as he was talking to them, indicating that they were noncompliant. Additionally, Kneier told Taylor that one of these brothers had assaulted an employee in her bar, although she admitted that she had gotten most or all of this information secondhand from other employees. D. Tanner objects to the information Kneier provided to Taylor

---

[19]<u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388, 395-397 (1971)(authorizing a federal cause of action for damages under certain constitutional provisions when government officials violate those respective constitutional rights).

as hearsay, but the Tenth Circuit has recognized that officers are permitted to rely on hearsay during an investigation for Fourth Amendment purposes.  See United States v. Mathis, 357 F.3d at 1206 ("We therefore conclude that the magistrate's reliance on hearsay information as a basis for probable cause to support the first search warrant was not in error."); United States v. $149,442.43 in U.S. Currency, 965 F.2d at 874 n.3 ("Although this statement is hearsay, and perhaps multiple hearsay, hearsay may be used to establish probable cause.").  Taylor could properly consider this information to determine whether Frazier had reasonable suspicion to detain D. Tanner.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d at 1134.  This standard is met by information "falling 'considerably short' of a preponderance standard."  United States v. Winder, 557 F.3d at 1134. Here, Taylor had information from an employee asserting that D. Tanner or his brother had committed a crime -- battery -- against an employee at the bar.[20]  Depending on the severity of the employee's injuries -- which Taylor could have reasonably believed were significant given that the assailant may have been moderately to severely intoxicated, caused commotion at the bar, and might have caused severe enough injuries to require one of the employees to fire pepper spray at the assailant -- the conduct could have also constituted some form of aggravated battery under New

---

[20]N.M.S.A. 1978, § 30-3-4 provides:

       Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner.

       Whoever commits battery is guilty of a petty misdemeanor.

N.M.S.A. 1978, § 30-3-4.

Mexico law.[21]  Aggravated battery is a misdemeanor when the defendant inflicts an injury that "is

not likely to cause death or great bodily harm, but does cause painful temporary disfigurement or

temporary loss or impairment of the functions of any member or organ of the body."  N.M.S.A.

1978, § 30-3-5(B).  The information available to Taylor would also provide reasonable suspicion

that D. Tanner had engaged in disorderly conduct under New Mexico law.[22]  While public

intoxication is itself not a crime under New Mexico law without the violation of some other criminal

statute in New Mexico, New Mexico state law does not "prohibit punishment for conduct that is

---

[21]N.M.S.A. 1978, § 30-3-5 provides:

A.      Aggravated battery consists of the unlawful touching or application of force
        to the person of another with intent to injure that person or another.

B.      Whoever commits aggravated battery, inflicting an injury to the person
        which is not likely to cause death or great bodily harm, but does cause
        painful temporary disfigurement or temporary loss or impairment of the
        functions of any member or organ of the body, is guilty of a misdemeanor.

C.      Whoever commits aggravated battery inflicting great bodily harm or does so
        with a deadly weapon or does so in any manner whereby great bodily harm
        or death can be inflicted is guilty of a third degree felony.

N.M.S.A. 1978, § 30-3-5.

[22]N.M.S.A. 1978, § 30-20-18 provides:

Disorderly conduct consists of:

A.      engaging in violent, abusive, indecent, profane, boisterous,
        unreasonably loud or otherwise disorderly conduct which tends to
        disturb the peace; or

B.      maliciously disturbing, threatening or, in an insolent manner,
        intentionally touching any house occupied by any person.

Whoever commits disorderly conduct is guilty of a petty misdemeanor.

N.M.S.A. 1978, § 30-20-18.

otherwise criminal or otherwise qualifie[s] as disorderly conduct merely because the offender may still be intoxicated." State v. Correa, 147 N.M. 291, 196, 222 P.3d 1, 6 (2009).  Notably, reasonable suspicion may be based on conduct that may otherwise be innocent, although punching an employee in a bar would only in rare circumstances qualify as innocent conduct.  See United States v. Winder, 557 F.3d at 1134.  Additionally, courts must evaluate an officer's conduct based on the facts and circumstances known to the officer at the time they acted.  See Saucier v. Katz, 533 U.S. at 205. Taylor arrived on the scene after Frazier was there, and did not have complete information about what had taken place before she arrived.  She did not have enough information, at least before she began speaking to Kneier to verify what had occurred, to know whether Frazier's conduct was justified.  Under the circumstances, she did not act unreasonably, because she had no duty to intervene into Frazier's investigative detention.  She herself had reasonable suspicion to investigate further, and had no reason to believe that Frazier lacked reasonable suspicion.

The information available to Taylor also did not trigger a duty to intervene in D. Tanner's subsequent arrest, because she herself had probable cause to believe that a criminal offense had occurred and no reason to believe that Frazier had improperly concluded that there was probable cause that a criminal offense occurred.  Notably, D. Tanner does not dispute Taylor's asserted fact that she had no involvement in the actual arrest.  Probable cause to make an arrest requires only that there is "a fair probability that a crime was being committed."  United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007).  Likewise, "[p]robable cause is measured against an objective standard of reasonableness and may rest on the collective knowledge of all officers involved in an investigation rather than solely on the knowledge of the officer who made the arrest."  United States v. Chavez, 660 F.3d 1215, 1224 (10th Cir. 2011).  The Fourth Amendment permits officers to arrest individuals for misdemeanors without a warrant if the officer has probable cause to believe that an

-47-

offense has been committed.  See Atwater v. City of Lago Vista, 532 U.S. 318, 340 n.11, 354

(2001)("If an officer has probable cause to believe that an individual has committed even a very

minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the

offender."); Tanberg v. Sholtis, 401 F.3d 1151, 1159 (10th Cir. 2005)("[A] warrantless arrest is

lawful under the Fourth Amendment if there is probable cause to believe that the person arrested has

committed an offense." (citing Atwater v. City of Lago Vista, 532 U.S. at 322)).[23]  Here, Taylor had

---

[23]New Mexico courts have imposed some stricter requirements than what the United States
Constitution imposes in the context of warrantless arrests:

> Thus, our constitution and case law lead us to hold that for a warrantless arrest to be
> reasonable the arresting officer must show that the officer had probable cause to
> believe that the person arrested had committed or was about to commit a felony and
> some exigency existed that precluded the officer from securing a warrant.  If an
> officer observes the person arrested committing a felony, exigency will be presumed.

Campos v. State, 117 N.M. 155, 160, 870 P.2d 117, 121 (1994).  New Mexico also follows the
"misdemeanor arrest rule" that "an officer 'may only arrest without a warrant one guilty of a
misdemeanor if committed in his presence."  City of Santa Fe v. Martinez, 148 N.M. 708, 710-11,
242 P.3d 275, 277-78 (2010).  New Mexico courts have, however, also recognized "probable cause
that a non-jailable offense has been committed does not automatically make arrest reasonable, and
that for such arrests to be reasonable, there must be specific and articulable facts which, taken
together with rational inferences from those facts, reasonably warrant [the additional] intrusion of
a full custodial arrest."   State v. Rodarte, 138 N.M. 668, 672, 25 P.3d 647, 651 (Ct. App.
2005)(alteration in original)(internal quotation marks omitted).  Additionally, as the Court has
previously stated:

> New Mexico provides that law-enforcement officers have the authority to
> arrest a person without a warrant if the arresting officer has reasonable grounds,
> based on personal investigation, to believe the person arrested has committed a
> crime.  See N.M. S.A.1978, § 66-8-125(B) ("To arrest without warrant, the arresting
> officer must have reasonable grounds, based on personal investigation which may
> include information from eyewitnesses, to believe the person arrested has committed
> a crime.").

United States v. Giangola, No. 07-0706, 2008 WL 6020505, at *23 (D.N.M. July 24,
2008)(Browning, J.).

    Violations of state law do not support a federal cause of action for violations of the United
States Constitution.  As this Court has stated:

-48-

information from an employee directly asserting that D. Tanner or his brother had committed a crime -- battery or possibly aggravated battery -- against an employee at the bar. That same information would have communicated to Taylor, along with Taylor's other observations, that Frazier could have reasonably concluded that there was a fair probability that one of the brothers had engaged in disorderly conduct in Frazier's presence after they had left the bar.

In the Fourth Amendment context, a court must be "guided by the realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers." United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted). At the time Taylor arrived, she had limited, if any, information about what Frazier had observed and about how long the situation outside the bar had been occurring. She did not know or have reason to know that Frazier had not himself observed D. Tanner engage in some crime, including at the very least disorderly conduct. The Court must take into account that she had

---

The Supreme Court has stated that '[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provisions.' Consistent with other circuit courts, the Tenth Circuit holds that the violation of state law and SOPs will not turn an otherwise constitutional use of force into a violation of § 1983.

Mata v. City of Farmington, 798 F.Supp.2d 1215, 1230-31 (D.N.M. 2011)(Browning, J.)(citations omitted)(quoting Davis v. Scherer, 468 U.S. 183, 194 (1984)). Thus, whether Frazier or Taylor violated New Mexico law is irrelevant as long as Taylor acted reasonably under the Fourth Amendment. See Franklin v. Thompson, 981 F.2d 1168, 1170 n.3 (10th Cir. 1992)("A claim of false arrest is premised on a lack of probable cause, a constitutional right under the Fourth Amendment. However, in Oklahoma, the standard for deciding the legality of a warrantless arrest for a misdemeanor is whether the offensive conduct occurred in the presence of the arresting officer. It can be presumed as a matter of law that if the higher standard is met, the officer had probable cause to arrest." (citations omitted)). Accord Knight v. Jacobson, 300 F.3d 1272, 1276-77 n.3 (11th Cir. 2002)(noting that every circuit that has addressed the issue has held that the Fourth Amendment does not include an in-the-presence requirement for warrantless misdemeanor arrests); 2 W. LaFave et al., Criminal Procedure § 3.5(a), at 202 (3d ed. 2007)("It appears that the Fourth Amendment presents no barrier to abolition of the felony-misdemeanor distinction so as to permit warrantless arrests on probable cause in all cases.").

obtained information from Kneier indicating that at least one of the brothers had engaged in criminal behavior. There was also a great deal of commotion outside when she arrived on the scene -- including Frazier yelling at D. Tanner and M. Tanner to stop. There were various people on the scene making loud noises that she could overhear. She personally observed and overheard these events. She could have reasonably concluded, or at the very least been reasonably mistaken, that they had disobeyed Frazier's instructions. Taylor arrived on the scene after Frazier was there, and did not have complete information about what had taken place before she arrived. Even if Frazier's probable cause determination was flawed, Taylor was entitled to rely on it in light of the information known to her if a reasonable officer would have relied on Frazier's determination. See Stearns v. Clarkson, 615 F.3d 1278, 1285 (10th Cir. 2010)("Rather, 'a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'").

D. Tanner argues that, without citing any authority, "Defendant Taylor was placed upon immediate notice that something was wrong with Defendant Frazier when she drove up and saw and heard his actions and yelling." Response at 15. Particularly when a fellow officer arrives on the scene after a first officer has already been at the scene, it is reasonable for the fellow officer to assume that the first officer is more familiar with the situation and not to question that officer's conduct solely because the officer is yelling at individuals in the crowd -- particularly when it is late at night outside a bar on St. Patrick's Day and the officers are responding to a violent altercation. See Stearns v. Clarkson, 615 F.3d at 1285 ("When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists."). Under those circumstances, even when drawing all reasonable inferences in D. Tanner's

favor, the Court cannot reasonably conclude that the information available to Taylor was such that a reasonable officer would have concluded that he or she was observing an unlawful arrest or that he or she would have had reason to know that an unlawful arrest was occurring. An officer in Taylor's position, particularly in light of the information she obtained from Kneier corroborating that the Tanners had likely committed crimes, could have reasonably relied on Frazier's probable cause determination.

Furthermore, as the situation progressed, she observed D. Tanner and Frazier struggling with Frazier's flashlight. While D. Tanner asserts that he was attempting to remove the flashlight from his neck so he could breathe, courts cannot, in the Fourth Amendment context, consider a suspect's subjective intentions not known to officers when evaluating an officer's conduct. See Reeves v. Churchich, 484 F.3d 1244, 1253 (10th Cir. 2007)("Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, the Reeves' subjective motives behind their failure to submit are irrelevant."). Taylor could see only the struggle, and there is no evidence indicating that D. Tanner had communicated his subjective intentions. She had also received information that one of these brothers had assaulted someone, and that either the other brother fired pepper spray at someone or that the employees sprayed pepper spray at the brother who punched the employee. A reasonable officer in Taylor's situation could have concluded that D. Tanner was resisting arrest[24] by trying to escape from Frazier or attempting to assault a peace officer[25] by trying to obtain the

---

[24]N.M.S.A. 1978, § 30-22-1 provides in pertinent part: "Resisting, evading or obstructing an officer consists of . . . intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him . . . ." N.M.S.A. 1978, § 30-22-1.

[25]N.M.S.A. 1978, § 30-22-21 provides:

A.      Assault upon a peace officer consists of:

flashlight and assault Frazier.  Resisting arrest and assaulting a peace officer are both misdemeanors under New Mexico law.  See N.M.S.A. 1978, §§ 30-22-1, 30-22-22.  An officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.  From Taylor's perspective, she had no duty to intervene in D. Tanner's arrest.  The result might be different if Taylor was present with Frazier throughout the entire duration of his conduct and had all the same information -- and no additional information from Kneier -- in Frazier's possession.  Consequently, the Court will grant summary judgment on D. Tanner's claims against Taylor asserted in Count I relating to her duty to intervene in the allegedly unlawful detention and arrest.  The Court will also grant summary judgment on the aspects of that claim alleging that Taylor acted improperly on the basis that D. Tanner was a Native American, because she could have reasonably concluded that Frazier had both reasonable suspicion and probable cause.  See Whren v. United States, 517 U.S. 806, 813-19 (1996)(recognizing that officer's subjective considerations about race are not relevant and that no pretextual stop occurs if officers have probable cause).

## II.   TAYLOR DID NOT HAVE A DUTY TO INTERVENE IN FRAZIER OR MCCOY'S ALLEGED USE OF EXCESSIVE FORCE.

D. Tanner argues that both Frazier and McCoy were using excessive force and that D. Tanner

---

> (1)   an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties; or
>
> (2)   any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery.

B.   Whoever commits assault upon a peace officer is guilty of a misdemeanor.

N.M.S.A. 1978, § 30-22-21.

should have intervened to stop them.  To hold Taylor liable for Frazier and McCoy's conduct, she must have observed or had reason to know that the other officers were using excessive force and a realistic opportunity to prevent their use of excessive force.  The Court concludes that, in light of the circumstances, the events Taylor observed did not trigger a duty to intervene in either officer's conduct.

In the context of excessive force, the Tenth Circuit has explained: "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Lundstrom v. Romero, 616 F.3d at 1126 (quoting Graham v. Connor, 490 U.S. at 396.  The Tenth Circuit has also recognized:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  And we take seriously that this calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

Lundstrom v. Romero, 616 F.3d at 1126 (quoting Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)).  When determining whether an officer's conduct constitutes excessive force during the process of an arrest, a court assumes that the arrest was lawful.  See Romero v. Story, No. 11-2139, 2012 WL 586698, at *7 (10th Cir. Feb. 23, 2012)("Instead, the district court must then analyze the excessive force inquiry under the assumption the arrest was lawful.").

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen ex. rel Sturdivan v. Murr, the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance

-53-

separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).  Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.

As a preliminary manner, the Court will examine all of D. Tanner's excessive force claims as they relate to Taylor under the Fourth Amendment only, because the Supreme Court has mandated that this procedure is the appropriate one for excessive force claims.  D. Tanner has alleged that, by failing to intervene in Frazier and McCoy's use of excessive force, she violated his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.  See Amended Complaint ¶¶ 65-67, at 10.  In Graham v. Connor, the Supreme Court held that courts should analyze all claims of excessive force in the context of an arrest or detention under the Fourth Amendment's reasonableness standard as opposed to a substantive due-process standard, because that constitutional provision expressly applies to that form of conduct.  See Graham v. Connor, 490 U.S. at 395.  Specifically, the Supreme Court said:

> Today we make explicit what was implicit in Garner's analysis, and hold that all claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather

than under a "substantive due process" approach.

Graham v. Connor, 490 U.S. at 395 (emphasis in original).  The Supreme Court later clarified that this holding "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).  Thus, D. Tanner cannot maintain his excessive force claims by relying on any constitutional provision other than the Fourth Amendment.

> **A.   D. TANNER HAS CONCEDED THAT TAYLOR HAD NO OBLIGATION TO INTERVENE UNTIL AFTER FRAZIER HAD STRUCK D. TANNER WITH THE FLASHLIGHT.**

D. Tanner conceded at the hearing on February 16, 2012, that Taylor had no obligation to intervene in Frazier's use of force against D. Tanner until Frazier had struck D. Tanner in the head with the flashlight.  D. Tanner first asserted that Taylor should have intervened and stopped Frazier's conduct as soon as she approached Frazier's vehicle.  See Tr. at 20:4-14 (Stoker).  D. Tanner then clarified that he did not expect Taylor to intervene until Frazier had struck him with the flashlight in the head.  See Tr. at 22:24-23:14 (Court, Stoker)("I'm [not] saying that she could do anything until the two strikes.").  Courts are entitled to rely upon counsel's concessions.  See United States v. Ventura-Perez, 666 F.3d 670, 676 (10th Cir. 2012)("Courts could not function properly if concessions by counsel cannot be relied upon."); Texaco, Inc. v. Hale, 81 F.3d 934, 938 (10th Cir. 1996)("Even had the scope of the remand allowed the district court to consider this issue, it was entitled to rely upon Appellants' concession, and they are now without a basis for objection.").  The Court otherwise agrees with the concession, because the Court concludes in a separate section of this Memorandum Opinion and Order that a reasonable officer in Taylor's position would not have believed that Frazier used excessive force against D. Tanner when he was choking D. Tanner on the

hood of the vehicle and when he then struck D. Tanner with the flashlight. Consequently, based on

the concession, the Court will grant the Motion on the issue of Taylor's obligation to intervene in

Frazier's allegedly excessive force for the events up until Frazier had finished striking D. Tanner

with the flashlight on the head on the hood of the vehicle, which includes the events where Frazier

placed the flashlight against D. Tanner's neck allegedly choking him.  See Frazier Dashboard

Camera at 23:46:55-47:30.

### B.   TAYLOR HAD NO OBLIGATION TO INTERVENE IN FRAZIER'S CONDUCT IN LIGHT OF THE CIRCUMSTANCES.

At the time Frazier took D. Tanner to the ground, Taylor had not observed any conduct that

would have made a reasonable officer in her position believe the force Frazier used was excessive.

Based on the limited amount of time Frazier had his flashlight pressed up against D. Tanner in a

choking manner and her knowledge that D. Tanner may have committed several offenses before the

altercation -- including aggravated battery -- Taylor would not have known or had reason to know

that Frazier was using excessive force against D. Tanner.  Because Taylor observed D. Tanner grab

at Frazier's flashlight and an ensuing struggle over the flashlight, she would not have known or had

reason to know that Frazier was using excessive force when he hit D. Tanner in the head with the

flashlight on the hood of the vehicle.  In light of the struggle between D. Tanner and Frazier, the

nature of Frazier's conduct while he had D. Tanner on the ground, and M. Tanner's presence at the

scene, Taylor had no duty to intervene when Frazier had D. Tanner on the ground.

Finding a factually identical case to the current one is difficult, but many cases involve

analogous factual situations and use of police force.  For example, the Tenth Circuit in Dixon v.

Richer, 922 F.2d 1456 (10th Cir. 1991), concluded that an officer used excessive force during a

traffic stop when a suspect "was kicked ([a] second time), struck with a flashlight, and then choked

and beaten" after "he had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats." 922 F.2d at 1462-63. After an altercation at a restaurant, a man threw a chair into some mirrors and caused some damage. See 922 F.2d at 1458. The man left the restaurant, and some others who were involved in the altercation left in a separate vehicle. See 922 F.2d at 1458. An officer arrived at the restaurant afterwards and talked with a security guard, who informed the officers that all the individuals involved had just left and gave the officer a description of one of the vehicles. See 922 F.2d at 1458. The officer incorrectly assumed that the plaintiffs had the man who damaged the mirrors along with them in their vehicle; the officer followed the plaintiffs' vehicle. See 922 F.2d at 1458. The officer pulled the vehicle over and the plaintiffs, a couple, exited the vehicle and approached the officers car; the officer told the plaintiffs to stop over his public address system -- an order which the couple obeyed. See 922 F.2d at 1458. The officer got out of his vehicle and pointed his handgun at the couple. See 922 F.2d at 1458. The male who exited the stopped vehicle asked why they were stopped, and the officer told the male to get up against the vehicle. See 922 F.2d at 1458. The male obeyed and spread his legs, and the officer frisked the male. See 922 F.2d at 1458. The officer told the male to move his legs back further. See 922 F.2d at 1458. The male did so, and the officer then kicked the male on the inside of one of his legs. See 922 F.2d at 1458. The male asked the officer if this conduct was necessary, and the officer then radioed for backup. See 922 F.2d at 1458. After other officers arrived and the officers sought to frisk the male again, one of the officers -- without warning -- kicked the male again in a forceful manner, causing the male to fall. See 922 F.2d at 1458. The officer who initially made the stop then hit the male in the stomach with a metal flashlight; all the officers then got on top of the male and began to beat and choke him, including with a nightstick. See 922 F.2d at 1458. The Tenth Circuit found summary judgment in favor of the officers improper,

concluding:

> Although Richer had a reasonable basis for stopping the Dixons, they were not suspected of committing any crime. The investigative stop was justified to ascertain whether the Dixons could provide information concerning the whereabouts of [the man who broke the mirrors] (who himself was only guilty of a misdemeanor). Yet neither Richer nor Yarbrough asked the Dixons about [the man who broke the mirrors]. When Willie Dixon identified himself, and asked why they had been stopped, Richer refused to inform him of the reason he was being detained.

> Willie Dixon did not resist being frisked. Showing due deference to Richer's judgment in an uncertain, and potentially dangerous circumstance, it is certainly possible that what Dixon perceived as a malicious kick was actually a reasonable act designed to position Dixon's legs for a pat down. Moreover, Dixon's response to being kicked the first time (turning around and swearing at Richer) could reasonably have been interpreted as an act of resistance. Richer's initial response, calling for a backup (Yarbrough), was both reasonable and prudent. But when Willie Dixon was kicked (the second time), struck with a flashlight, and then choked and beaten, he had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats. While it is reasonable to frisk a detainee suspected of carrying a weapon, it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.

> As for resisting arrest, it bears reminding that the Dixons were not under arrest. They were ostensibly stopped in order to be asked some questions. That Willie Dixon resisted being choked and beaten does not retroactively justify it. Neither does Hyon Dixon's resistance retroactively justify the alleged treatment of her or her husband.

> For purposes of summary judgment, viewing the totality of the circumstances judged solely under the Dixons' version of the facts, we agree with the district court that the alleged conduct is not objectively reasonable under the Fourth Amendment.

922 F.2d at 1462-63.

In Weigel v. Broad, the Tenth Circuit addressed a comparable factual pattern to the current case where it evaluated whether an officer using a maneuver that restricted a suspect's airflow constituted excessive force. Two officers were traveling in separate cars, and an individual struck one of the officer's cars with a vehicle from behind. See 544 F.3d at 1147. The individual's vehicle then "careened through the median strip and re-entered I-25 south." 544 F.3d at 1147. One of the

officers approached the individual's vehicle to assess his injuries.  See 544 F.3d at 1147.  The

individual reported to officers that "he believed his vehicle's steering linkage had come loose or

broken."  544 F.3d at 1147.  The individual could not produce a driver's license, and both officers

smelled alcohol on his breath.  See 544 F.3d at 1147-48.  The officers then asked the individual to

submit to a field sobriety test, to which the individual agreed.  See 544 F.3d at 1148.  Officers

planned to conduct the test on the other side of the interstate.  See 544 F.3d at 1148.  A van was

approaching, and officers instructed the individual to wait to cross the highway.  See 544 F.3d at

1148.  The individual then darted in front of the van and was struck in the chest by the passing van's

sideview mirror.  See 544 F.3d at 1148.  One of the officers called an ambulance, and the individual

continued to try and cross the highway.  See 544 F.3d at 1148.  Onlookers described the individual's

behavior as "strange," "bizarre," "odd," "not normal," and "erratic."  544 F.3d at 1148.  Concerned

for the individual's safety, one of the officers tackled him and wrestled him to the ground in a ditch

alongside the highway.  See 544 F.3d at 1148.  There were conflicting reports of the struggle, but

it was "generally agreed that [the individual] fought vigorously, attempting repeatedly to take the

troopers' weapons and evade handcuffing."  544 F.3d at 1148.  "In the midst of the melee, Trooper

Henderson put [the individual] in a choke hold."  544 F.3d at 1148.  The individual continued to

resist and fight.  See 544 F.3d at 1148.  The other officer was able to put handcuffs on the individual

while the individual was in the choke hold.  See 544 F.3d at 1148.  The individual continued to

struggle while handcuffed.  See 544 F.3d at 1148.  A bystander laid on the individual's legs to

restrict the individual's movement.  See 544 F.3d at 1148.

      The officers maintained the individual in a face down position, with the bystander sitting on

the individual's legs, one of the officers positioned on the individual's thighs and buttocks holding

the individual's arms in place, and another officer sitting on the individual's upper torso.  See 544

F.3d at 1148.  After the individual's legs were bound and hands handcuffed, the officer positioned on the individual's thighs and buttocks got up and "went to his vehicle to warm his hands."  544 F.3d at 1148-49.  There was evidence that, once this officer had gotten off of the individual, the bystander and the other officer sat on the individual for approximately three minutes.  See 544 F.3d at 1152.  The individual went into cardiac arrest and died as a result of "mechanical asphyxiation caused by inhibition of respiration by weight applied to the upper back."  544 F.3d at 1149.  There was evidence that the officers were aware of this risk of asphyxiation, and that the individual's "intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation."  544 F.3d at 1149-52.  The Tenth Circuit reversed the district court's grant of summary judgment on qualified immunity grounds, because "there is evidence that for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death."  544 F.3d at 1153-55.

In Post v. City of Fort Lauderdale, 7 F.3d 1552 (11th Cir. 1993), the Eleventh Circuit dealt with a case where an officer choked a suspect for approximately "five seconds."  7 F.3d at 1559-60.  Officers arrived at a restaurant several times to investigate building code violations for having too many occupants inside the building.  See 7 F.3d at 1555.  One of the owner's was arrested during one of the investigations, and the manager was arrested for obstructing an officer and resisting arrest.  See 7 F.3d at 1555.  Bystanders said that the manager "was doing nothing to interfere with the code team when he was arrested."  7 F.3d at 1556.  The manager admitted that he told an employee to turn down the radio after the owner was arrested, after which an officer told him to be quiet.  See 7 F.3d at 1556.  After the manager repeated this instruction to the employee, the officer told the manager he was under arrest.  See 7 F.3d at 1556.  At this time, the manager put his hands

up -- with the manager stating that he put his hands up to be handcuffed.  See 7 F.3d at 1556.  The

officer then told the manager "to stop resisting arrest, spun him around, placed him against a display

case, applied a choke hold, and handcuffed him."  7 F.3d at 1556.  The manager kept speaking

outside after officers told him to be quiet, and the same officer pushed the manager against a wall.

See 7 F.3d at 1556.  Before the night of the arrests, another officer had informed the arresting officer

that he had recently arrested the manager for resisting arrest and that the manager's resistance had

been violent.  See 7 F.3d at 1559.  The Eleventh Circuit concluded that the force used inside the

restaurant was not excessive in light of the circumstances.  See 7 F.3d at 1559.  The Eleventh Circuit

explained:

> Whether a specific use of force is excessive turns on factors such as the
> severity of the crime, whether the suspect poses an immediate threat, and whether
> the suspect is resisting or fleeing.  Use of force must be judged on a case-by-case
> basis "from the perspective of a reasonable officer on the scene, rather than with the
> 20/20 vision of hindsight."  Because this standard establishes no bright line, qualified
> immunity applies unless application of the standard would inevitably lead every
> reasonable officer in Sellers-Sampson's position to conclude the force was unlawful.
>
> Before the night of the arrests, another officer told Sellers-Sampson that he
> had recently arrested Lirio for resisting arrest and that Lirio's resistance had been
> violent.  Plaintiffs admit that Lirio was in a choke hold for about "five seconds" and
> that he sought no medical treatment until almost three years after the arrest.  When
> Lirio raised his hands, a reasonable officer in Sellers-Sampson's place could have
> concluded that the technique Sellers-Sampson used was needed to stop Lirio from
> becoming violent.

7 F.3d at 1559 (citations omitted).  The Eleventh Circuit agreed with the manager that, once he was

handcuffed and outside, "no further force was needed," but concluded that the push outside the

restaurant "was not plainly unlawful" and did not violate clearly established law.  7 F.3d at 1559-60.

The Eleventh Circuit reversed the district court's denial of summary judgment on qualified

immunity grounds as to this officer -- Sellers-Sampson.  See 7 F.3d at 1561.

        In Mann v. Yarnell, 497 F.3d 822 (8th Cir. 2007), the United States Court of Appeals for the

Eighth Circuit concluded that an officer did not act unreasonably when he used a brachial stun technique to immobilize a recalcitrant and potentially dangerous suspect. See 497 F.3d at 826. "The technique involves the application of an officer's forearm to an area of major muscle mass," in this case the side of the suspect's neck, "in order to induce temporary paralysis." 497 F.3d at 824 n.3. Earlier in the evening of the night the incident took place, the suspect "fired a shot at pursuing police officers and fled to his home." 497 F.3d at 823-24. While at his home, the suspect "took a shower to 'come down' off a methamphetamine high, and went to sleep." 497 F.3d at 824. The suspect's wife was at the home and traveled to the local police station to report that she had been a victim of domestic abuse earlier in the day. See 497 F.3d at 824. She told officers that her husband

> was in an irrational and paranoid state, that he had been using methamphetamine for five continuous days, and that he had slept only four hours during this time period, that he both cooked methamphetamine and kept firearms and ammunition at his home, that he had frequently threatened suicide, and that he had stated that he would "shoot it out with the police" and would "[g]o out in a blaze of glory with a gunfight with police" if they tried to arrest him.

497 F.3d at 824. Officers went to the home and asked the husband to leave the home, using a loudspeaker. See 497 F.3d at 824. After he would not come out of the home, officers fired tear gas into the home, after which time the husband came out. See 497 F.3d at 824. Officers ordered the man to get on his stomach and put his hands behind his back. See 497 F.3d at 824. The man moved to the designated location, but did not get down on his stomach or place his hands behind his back. See 497 F.3d at 824. Officers had a dog bite the man in the leg while they handcuffed him, but the man struggled and slipped away. See 497 F.3d at 824. In the process, the man knocked the handcuffs out of one of the officer's hands and grabbed the barrel of one of the officer's guns. See 497 F.3d at 824. When the man was on his feet and the officers continued to handcuff him, one officer "struck [the man] five times, with short pauses between blows," in what the officer described

"as a repeated application of a 'brachial stun' technique."  497 F.3d at 824.  The Eighth Circuit

affirmed the district court's grant of summary judgment on qualified immunity grounds as to the use

of this force, stating:

> The officers at the scene had been told that Mann was in a paranoid, belligerent, drug-crazed state and intended to do violence to the police if and when they should attempt to arrest him.  They also knew that Mann had fired a gun at pursuing officers to escape apprehension and had allegedly assaulted his wife.  We conclude that, with this information in mind, a reasonable officer would approach the situation with heightened caution and would be primed to quickly apply appropriate force in response to any appearance of resistance or aggression.

497 F.3d at 826.

**1.** **In Light of the Surrounding Circumstances, Frazier Pressing His Flashlight Against D. Tanner's Throat in a Choking Manner Would Not Have Appeared to Be Excessive Force to a Reasonable Officer in Taylor's Position.**

The Court must proceed in its excessive force analysis under the assumption that Frazier's

arrest was lawful -- or, more specifically, was lawful from a reasonable officer in Taylor's position.

See Romero v. Story, 2012 WL 586698, at *7.  As the Court has previously discussed, Frazier could

have potentially arrested D. Tanner, based on D. Tanner's conduct inside the bar and outside the bar,

for: (i) battery; (ii) aggravated battery; and (iii) disorderly conduct.  If the Court determines that,

from a reasonable officer in Taylor's position, Frazier was not using excessive force at the time he

began to choke D. Tanner with a flashlight on the hood of the vehicle and was otherwise properly

pursuing an arrest, Frazier could have lawfully arrested D. Tanner for resisting arrest and attempting

to assault a peace officer once D. Tanner began to struggle and had his hands on the flashlight.  See

Dixon v. Richer, 922 F.2d 1462-63 ("As for resisting arrest, it bears reminding that the Dixons were

not under arrest.  They were ostensibly stopped in order to be asked some questions.  That Willie

Dixon resisted being choked and beaten does not retroactively justify it.").

As the Court has already discussed, the Court concludes that it should take into account an information imbalance between officers in evaluating whether a secondary officer had a duty to intervene in another officer's conduct.  Thus, the Court will take into account any imbalances in information between Taylor and Frazier in its excessive force analysis.  It is undisputed that Taylor arrived on the scene after Frazier.  In the sequence of facts that the parties have set out, there is no indication that Taylor had a chance to communicate directly with D. Frazier before Kneier got Taylor's attention and began to speak to her.  The extent of Taylor's communication with Frazier before he began using force on D. Tanner was that she overheard Frazier yell, and then instruct D. Tanner and M. Tanner to stop walking away.  Even viewing the facts in the light most favorable to D. Tanner, the facts as presented do not support an inference that Frazier otherwise communicated substantive information about the situation to Taylor prior to Frazier's use of force on D. Tanner.

When Taylor talked with Kneier, Kneier stated that there was a scuffle in the bar and that one of the brothers punched an employee at the bar, but stated that her information was from other employees and that she did not know who attacked who.  Kneier stated that someone fired pepper spray after the brother had punched an employee, but it was not clear from the conversation who fired the pepper spray other than that it was someone different than the brother who punched the employee.  While Taylor was speaking with Kneier, Taylor's back was towards Frazier but she heard him yelling.  During this interview with Kneier, Taylor looked over her shoulder several times in the direction where Frazier was talking to D. Tanner and his brother.  During the interview, she could hear Frazier's yelling.  While Taylor was interviewing Kneier, Frazier dragged D. Tanner to the police vehicle, and slammed him on the hood of the vehicle and began to beat him shortly afterwards.  Before Taylor walked over to the vehicle, she was standing approximately twenty feet away.  Once she turned towards Frazier and saw D. Tanner on the hood of Frazier's vehicle, she had

an unobstructed view of the struggle, including Frazier pushing his flashlight against D. Tanner's throat. Taylor then observed both Frazier and D. Tanner holding Frazier's flashlight. D. Tanner asserts that he attempted to push the flashlight away from his throat and larynx, because his airway was blocked and he was unable to breathe.

Drawing all reasonable inferences in D. Tanner's favor, Taylor would have had a general familiarity with Frazier's interactions with D. Tanner and M. Tanner while she was talking with Kneier. Because, however, Taylor had her attention primarily focused on Kneier, had her back turned to much of what was going on, and was looking only over her shoulder to view interactions that were approximately twenty feet away -- as opposed to directing her full attention to those interactions -- it is not a reasonable inference that she had full awareness of what was going on between Frazier and the Tanners. See Hunt v. Cromartie, 526 U.S. at 551 ("Reasonable inferences from the undisputed facts can be drawn in favor of a racial motivation finding or in favor of a political motivation finding." (emphasis added)). That Taylor had not directly communicated with Frazier would also support a conclusion that there is no reasonable inference that she had full awareness of what was going on between Frazier and the Tanners while she was talking to Kneier.

That Frazier used force to effectuate the arrest does not, by itself, make the force excessive. "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Lundstrom v. Romero, 616 F.3d at 1126 (quoting Graham v. Connor, 490 U.S. at 396).

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. And we take seriously that this calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

Lundstrom v. Romero, 616 F.3d at 1126.  Courts give increased flexibility to officers who use force

when an officer reasonably concludes that a suspect is likely to fight back, even if the officer is

mistaken.  See Jiron v. City of Lakewood, 392 F.3d at 415 ("If an officer reasonably, but mistakenly,

believed that a suspect was likely to fight back . . . the officer would be justified in using more force

than in fact was needed." (quoting Saucier v. Katz, 533 U.S. at 205)); Estate of Larsen ex rel.

Sturdivan v. Murr, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before

taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'").

> To determine whether Frazier's force was excessive from Taylor's perspective, it is

necessary to consider several factors.  For cases where the suspect has a weapon, the Tenth Circuit

has provided the following factors:

> In assessing the degree of threat facing officers, then, we consider a number of
> non-exclusive factors.  These include (1) whether the officers ordered the suspect to
> drop his weapon, and the suspect's compliance with police commands; (2) whether
> any hostile motions were made with the weapon towards the officers; (3) the distance
> separating the officers and the suspect; and (4) the manifest intentions of the suspect.

Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260.  In more general cases where it does

not appear the suspect has a weapon, courts should consider the following factors:

> Reasonableness is evaluated under a totality of the circumstances approach which
> requires that we consider the following factors: the severity of the crime at issue,
> whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d at 1151-52 (citations omitted).  A court assesses "objective

reasonableness based on whether the totality of the circumstances justified the use of force, and

[must] pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen

ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

> Given that the facts do not suggest that D. Tanner was brandishing a weapon, putting aside

the subsequent struggle for the flashlight, the Court will apply the factors outlined in Weigel v. Broad. First, from Taylor's perspective, the crimes at issue were moderately severe when Frazier slammed D. Tanner against the hood and began to choke him with the flashlight. There was no information suggesting to Taylor that D. Tanner had committed any felonies or violent felonies, such as robbery or murder. The crimes were violent in nature, however, given that Kneier had informed Taylor that one of the brothers had punched an employee in a bar and that someone had fired pepper spray shortly after that. It was unclear from the conversation who fired the pepper spray, so one of the brothers could have potentially fired the pepper spray. Additionally, the crimes are more severe than those in Dixon v. Richer, where there was some property damage to mirrors in a restaurant. See 922 F.2d 1458. The crimes are also more severe than those in Post v. City of Fort Lauderdale, where the officer concluded the manager was obstructing an arrest for building code violations when the manager kept speaking after the officer told him to be quiet. See 7 F.3d 1556.

Second, there were moderate indications to Taylor that D. Tanner may have posed an immediate risk to officer health or safety. Courts generally give officers more leniency in the excessive force context when they have specific information available to them indicating that a suspect has engaged in violent behavior in the past. For instance, the Eleventh Circuit gave greater deference to an officer's use of force in Post v. City of Fort Lauderdale when the defendant had information from a second officer that, "[b]efore the night of the arrests," the second officer "had recently arrested [the suspect] for resisting arrest and that [the suspect's] resistance had been violent." 7 F.3d at 1559. In a more extreme case with a particularly violent defendant, the Eighth Circuit explained:

> The officers at the scene had been told that Mann was in a paranoid, belligerent, drug-crazed state and intended to do violence to the police if and when they should attempt to arrest him. They also knew that Mann had fired a gun at

pursuing officers to escape apprehension and had allegedly assaulted his wife. We conclude that, with this information in mind, a reasonable officer would approach the situation with heightened caution and would be primed to quickly apply appropriate force in response to any appearance of resistance or aggression.

Mann v. Yarnell, 497 F.3d at 826. While D. Tanner did not present the level of risk which the defendant presented in Mann v. Yarnell, Taylor was aware that D. Tanner or his brother had already assaulted an employee that night in a nearby bar. It was approximately 11:45 p.m. on St. Patrick's Day when Taylor arrived at the scene, and she had heard from an employee working at the bar that either D. Tanner or his brother had assaulted an employee. She had heard that someone, possibly one of the brothers, had also fired pepper spray. Given that the altercation occurred at a bar late at night, she could reasonably assume that the Tanners had been consuming at least a moderate, and potentially a great deal, amount of alcohol. A prudent, cautious, and trained officer would believe that a person who had already punched an employee in a bar that night and who had been consuming an unknown quantity of alcohol could act in a violent and unpredictable manner. A reasonable officer in that position could reasonably assume that a greater amount of force was necessary to detain D. Tanner in comparison to the force used to restrain a sober individual who had not attacked anyone. See Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260. While it was not clear that the Tanners had used a weapon, the ambiguity of the conversation Taylor had with Kneier left open the question whether one of the Tanners had fired pepper spray. On the other hand, there were no indications that the Tanners were using firearms or had attacked police officers, unlike the particularly unpredictable suspect in Mann v. Yarnell. See 497 F.3d at 826. Thus, there was a moderate chance that D. Tanner posed an immediate risk to officer health or safety such that officers could justifiably respond more forcefully to hostile conduct or otherwise ambiguous conduct that could reasonably be seen as resistant. See Dixon v. Richer, 922 F.2d at 1462-63 ("Moreover,

Dixon's response to being kicked the first time (turning around and swearing at Richer) could reasonably have been interpreted as an act of resistance.").  As the Eleventh Circuit explained:

> Plaintiffs admit that Lirio was in a choke hold for about "five seconds" and that he sought no medical treatment until almost three years after the arrest.  When Lirio raised his hands, a reasonable officer in Sellers-Sampson's place could have concluded that the technique Sellers-Sampson used was needed to stop Lirio from becoming violent.

Post v. City of Fort Lauderdale, 7 F.3d at 1559.

Third, there were some indications to Taylor that D. Tanner sought to evade arrest, although she observed no signs that he intended to physically resist arrest until the struggle occurred on the hood of Frazier's vehicle.  When she arrived, Taylor heard Frazier instruct the Tanners to stop while they were walking away, and she saw Frazier follow these individuals to talk to them.  D. Tanner put forth an asserted fact that he and his brother did not intend to disobey Frazier's instructions when they initially walked away from him around the time of Taylor's arrival.  That fact is not legally relevant in this context, however, as courts may not consider a suspect's subjective intentions for their actions when those intentions are unknown to the officer.  See Reeves v. Churchich, 484 F.3d at 1253 ("Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, the Reeves' subjective motives behind their failure to submit are irrelevant.").  The relevant video footage shows the brothers walking away from Frazier's direction.  Nevertheless, they were not quickly running away from Frazier in a way that would suggest they were at risk of sprinting away.  Thus, until the struggle occurred, there was a minor to moderate risk that D. Tanner would attempt to evade arrest.  Applying the three factors in Weigel v. Broad indicates that there was a moderately heightened justification for force than would be present in a case where none of the factors in Weigel v. Broad weighed in favor of heightened force.  See 544 F.3d at 1151-52.

Given the information known to Taylor and her observations, Frazier's placing of his

flashlight against D. Tanner's throat for approximately ten seconds would not have constituted excessive force to a reasonable officer in Taylor's position.  "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Lundstrom v. Romero, 616 F.3d at 1126.  Recognizing that any arrest or investigatory stop carries with it the right to use some degree of physical force or threat of force, there was a moderately heightened justification for the use of force under the circumstances.  From Taylor's perspective, given the information she had received from Kneier, D. Tanner would have constituted a potentially violent suspect.  A reasonable officer would have also thought it was likely that D. Tanner was at least moderately, and possibly highly, intoxicated.  While Taylor had a general familiarity with Frazier's interactions with D. Tanner, it is not a reasonable inference that she observed everything that occurred between the two men before Frazier had D. Tanner on the vehicle's hood.  She could have reasonably concluded, given the information she had received from Kneier and her other observations, that Frazier had observed D. Tanner take some threatening action or an action which could reasonably be construed as threatening, and which would justify the use of this force.  See Dixon v. Richer, 922 F.2d at 1462-63; Post v. City of Fort Lauderdale, 7 F.3d at 1559.  D. Tanner has conceded that Taylor had no obligation to intervene until after Frazier had struck D. Tanner with the flashlight, which did not occur until after the choking incident.  See Tr. at 22:24-23:14 (Court, Stoker).

If Frazier had held the flashlight in a choking position for a much longer period of time, such as a period of minutes rather than seconds, there would potentially be a genuine dispute of material fact whether Taylor observed excessive force.  See Weigel v. Broad, 544 F.3d at 1153-55 ("[T]here is evidence that for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant

danger of asphyxiation and death."). Unlike the situation in Weigel v. Broad, which involved an officer sitting for three minutes on a bound suspect's back causing him to become asphyxiated, this short period of choking did not create a significant danger of asphyxiation or death. See Weigel v. Broad, 544 F.3d at 1153-55. If officers had already handcuffed D. Tanner or otherwise subdued him at the point in time Frazier took this action, like the situation in Weigel v. Broad, there would also potentially be a genuine factual question whether Taylor observed excessive force. See Weigel v. Broad, 544 F.3d at 1153-55. Likewise, if several officers had been choking or otherwise assaulting D. Tanner, like the situation in Dixon v. Richer, there would potentially be a factual question whether Taylor observed excessive force. See 922 F.2d at 1458-59 ("Without warning, one of them kicked Mr. Dixon again, so forcefully that he started to fall. As Mr. Dixon fell, Richer hit him in the stomach with a metal flashlight. Once on the ground, the deputies got on top of him and began to beat and choke him."). Denial of summary judgment might also be appropriate if there was no information available to Taylor that D. Tanner had committed a crime or posed a threat of harm -- such as if no one had reported that the Tanners had engaged in violent conduct or were intoxicated. See Dixon v. Richer, 922 F.2d at 1462-63 ("Although Richer had a reasonable basis for stopping the Dixons, they were not suspected of committing any crime.").

This choking incident is most factually analogous to Post v. City of Fort Lauderdale, where the Eleventh Circuit concluded that the district court improperly denied summary judgment when an officer choked a suspect during an arrest for approximately five seconds. See 7 F.3d at 1559. Notably, the potential crimes D. Tanner committed, including aggravated battery, are more serious than the crimes the suspect in Post v. City of Fort Lauderdale committed, obstructing an arrest by continuing to talk after the officer had told the suspect to stop. See 7 F.3d at 1559-60. The increased severity of the crime makes Post v. City of Fort Lauderdale persuasive in that

approximately ten seconds of choking is not materially different than five seconds of choking in light of the increased risk of violence D. Tanner posed. See 7 F.3d at 1559-60. Likewise, there were no facts indicating that the suspect in Post v. City of Fort Lauderdale posed any chance of being moderately to highly intoxicated. See 7 F.3d at 1559-60.

Lastly, simply because Frazier could have used some other less forceful method to restrain D. Tanner is not material, because his use of the flashlight in a choking maneuver would have appeared reasonable to a reasonable officer in Taylor's position. "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (citations omitted)(internal quotation marks omitted). Similarly, in United States v. Sharpe, the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87.

Based on the imbalance of information between Taylor and Frazier, the Court does not have to decide whether Frazier used excessive force in choking D. Tanner with a flashlight or in slamming D. Tanner against the vehicle's hood. The question before the Court is whether a reasonable officer in Taylor's position would have, based on the information known to her, concluded that Frazier was using excessive force. It may well be that the analysis would be different if the Court focused on the facts known only to Frazier -- which are not clear on the record before the Court as the parties have focused on the facts known to Taylor. For instance, no parties have

presented an affidavit from Frazier or any deposition testimony from Frazier.  Depending on the

facts known to Frazier, he may have used excessive force or there may have been genuine issues of

material fact on that question.  On the record before the Court, even when drawing all reasonable

inferences in D. Tanner's favor, a reasonable, well-trained officer in Taylor's position would not

have concluded that Frazier was using excessive force in slamming D. Tanner against the vehicle's

hood and then choking him.

> ## 2.   In Light of the Surrounding Circumstances, Frazier Hitting D. Tanner in the Head with the Flashlight While D. Tanner Was on the Hood of the Vehicle Would Not Have Appeared to Be Excessive Force to a Reasonable Officer in Taylor's Position.

The Court must proceed in its excessive force analysis under the assumption that Frazier's

arrest was lawful -- or more specifically was lawful from the perspective of a reasonable officer in

Taylor's position.  See Romero v. Story, 2012 WL 586698, at *7.  Frazier could have potentially

arrested D. Tanner, based on D. Tanner's conduct inside the bar and outside the bar, for: (i) battery;

(ii) aggravated battery; and (iii) disorderly conduct.  Because the Court has determined that, from

a reasonable officer in Taylor's position, Frazier was not using excessive force at the time he began

to choke D. Tanner with a flashlight on the hood of the vehicle, Frazier could have lawfully arrested

D. Tanner for resisting arrest and attempting to assault a peace officer once D. Tanner began to

struggle and had his hands on the flashlight.  See Dixon v. Richer, 922 F.2d 1462-63 ("As for

resisting arrest, it bears reminding that the Dixons were not under arrest.  They were ostensibly

stopped in order to be asked some questions.  That Willie Dixon resisted being choked and beaten

does not retroactively justify it.").  While officers cannot retroactively justify using additional force

on a suspect because he resists when they had no basis for the initial use of force, Frazier's use of

the flashlight in a choking maneuver was reasonable under the circumstances from a reasonable

officer in Taylor's position.  Based on the limited information available to Taylor as well as the information she received from Kneier, it would not have been apparent to a reasonable officer in her position that Frazier was not otherwise properly pursuing an arrest for at the very least disorderly conduct.  Based on her arrival at the scene after Frazier was there and the limited information she had about the specifics of Frazier's interactions with Taylor, she could reasonably conclude that Frazier was pursuing an arrest for the offenses D. Tanner had likely committed.  See Stearns v. Clarkson, 615 F.3d at 1285 ("Rather, 'a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'"); id. at 1285 ("When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists.").  Thus, it would have appeared to Taylor that D. Tanner was likely resisting arrest or attempting to assault Frazier when he began to struggle with Frazier.

Once D. Tanner and Frazier began to struggle for the flashlight, the justification for force would have increased in the eyes of a reasonable officer in Taylor's position.  Officers are permitted to use a greater degree of force when they reasonably believe that a suspect is resisting arrest or attempting to harm them, even if that belief is mistaken -- as long as the mistake is reasonable.  See Jiron v. City of Lakewood, 392 F.3d at 415 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed."); Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'").  The Tenth Circuit has recognized these considerations by incorporating them in its three-factor analysis for whether the force used was reasonable, which

-74-

instructs courts to consider: (i) the severity of the crime at issue; (ii) whether the suspect poses an immediate threat to the safety of the officers or of others; and (iii) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  See Weigel v. Broad, 544 F.3d at 1151-52.

Based on the ensuing struggle over the metal flashlight, which D. Tanner could have potentially used as a weapon against Frazier, D. Tanner's conduct makes the second and third factors weigh more heavily in favor of the use of force than they would have before D. Tanner had started struggling with Frazier.  A suspect who is physically struggling with an officer poses an immediate threat to officers' safety.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.  Likewise, from Taylor's perspective, Frazier was pursuing a lawful arrest, and Tanner was actively resisting arrest when he began to struggle with Frazier over the flashlight.  Even if Frazier and Taylor were mistaken whether D. Tanner intended to resist, a reasonable officer in Taylor's position could have concluded that D. Tanner posed a greater risk than before he began to struggle, thus increasing the justification for force.  D. Tanner asserts that he was moving the flashlight away from his throat, because he could not breathe.  That fact is not legally relevant in this context, however, as courts may not consider a suspect's subjective intentions for the suspect's actions when those intentions are unknown to the officer.  See Reeves v. Churchich, 484 F.3d at 1253 ("Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, the Reeves' subjective motives behind their failure to submit are irrelevant.").

After assessing the level of justification for force, the Court must consider whether the force Frazier used, from the perspective of a reasonable officer in Taylor's position, was excessive in light of the level of justification for force.  Courts have had some trouble deciding whether the use of a

-75-

flashlight to beat someone constitutes deadly force.  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  Carr v. Castle, 337 F.3d 1221, 1227 (10th Cir. 2003)(quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)).  As the Tenth Circuit noted:

> Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Carr v. Castle, 337 F.3d at 1227 (quoting Tennessee v. Garner, 471 U.S. at 11).  On the other hand, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  Tennessee v. Garner, 471 U.S. at 11.  Courts should consider whether the officers were in danger at the moment that they used force, and whether the officers' reckless or deliberate conduct during the seizure unreasonably created the need to use such force.  See Phillips v. James, 422 F.3d at 1083.

In an unpublished opinion, the Eleventh Circuit noted the "dearth of case law" on the issue whether "the use of a flashlight to strike an arrestee over the head necessarily constitutes excessive force."  Baltimore v. City of Albany, Ga., 183 F.App'x 891, 898 (11th Cir. 2006)(unpublished).  It noted that "[a] few cases in this circuit and elsewhere have differed as to whether striking a suspect over the head with a blunt object could per se cause death or serious injury, or whether it even constitutes excessive force."  Baltimore v. City of Albany, Ga., 183 F.App'x at 898.  The Eleventh Circuit ultimately concluded, relying on "the cases that have specifically addressed the issue," that "there appears to be agreement that striking a suspect in the head with a heavy flashlight or other

-76-

blunt instrument at least poses a 'substantial risk of serious bodily injury,' if not death." <u>Baltimore v. City of Albany, Ga.</u>, 183 F.App'x at 898.  The United States Court of Appeals for the Ninth Circuit has indicated that, where it is not as a matter of law clear that an instrument constitutes deadly force, it is a question of fact whether it is an instrument of deadly force.  <u>See</u> <u>Chew v. Gates</u>, 27 F.3d 1432, 1453 (9th Cir. 1994)("Whether a particular instrument of force qualifies as an instrument of deadly force is a question of fact.").  <u>Accord</u> <u>Robinette v. Barnes</u>, 854 F.2d 909, 912 (6th Cir. 1988)("Thus, whether deadly force has been used to seize a criminal suspect must be determined in the context of each case.").  The Tenth Circuit has resisted classifying instruments as deadly force as a matter of law.  <u>See</u> <u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1315 ("Initially, we decline to deem a police dog's ability to bite and hold to be sufficient to make Chaos's release, alone, an act of deadly force.  To hold otherwise could result in nearly every release of a police dog being considered deadly force.").  As the Tenth Circuit has explained: "It is no secret that many tools in law enforcement can potentially inflict serious bodily harm or even death.  Some of these tools, however, also have great potential to resolve situations without resort to comparatively more lethal force."  <u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1315-16.  The Court finds the Tenth Circuit's logic persuasive, if not controlling, and will not treat the use of a flashlight as the use of deadly force per se.  The use of a flashlight raises a factual issue whether the flashlight constitutes deadly force, which a factfinder would resolve under all of the case's circumstances.  Because the Court cannot resolve questions of fact on summary judgment, however, and must draw all reasonable inferences in D. Tanner's favor, it will assume that the use of the flashlight qualifies as deadly force under the facts of this case given that Frazier struck D. Tanner in the head with the flashlight.

          Assuming the flashlight used in this manner could qualify as deadly force, the Court should

also take into account that the weapon could become an instrument capable of deadly force in D. Tanner's hands. Courts give more flexibility to officers to use deadly force when they are threatened with the use or potential use of a weapon against them. See Phillips v. James, 422 F.3d at 1083. As the Tenth Circuit has stated, "if threatened by [a] weapon . . . , an officer may use deadly force." Thomas v. Durastanti, 607 F.3d 655, 664 (10th Cir. 2010). Taylor could have reasonably believed, based on the struggle between Frazier and D. Tanner, that Frazier was in danger and that D. Tanner could have acquired the weapon. To justify the use of deadly force, an officer must have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Carr v. Castle, 337 F.3d at 1227. Particularly because Frazier had to react to what both he and Taylor could have reasonably perceived as D. Tanner resisting arrest or attempting to harm Frazier, Frazier's hitting D. Tanner on the head with the flashlight would not have appeared to be excessive force to a reasonable officer in Taylor's position. All three of the factors from Weigel v. Broad indicate there was at least a moderate, and in some cases a relatively strong, justification for the use of force. Likewise, Taylor had probable cause to believe that D. Tanner posed a serious threat of physical harm to Frazier, particularly based on the struggle between Frazier and D. Tanner. Taylor had information that one of the Tanners attacked someone and may have fired pepper spray at someone. She could have also reasonably concluded that D. Tanner was moderately to severely intoxicated. From the perspective of a reasonable officer in Taylor's position, D. Tanner would have appeared to be physically resisting arrest. Frazier's striking of D. Tanner two times in the head with the flashlight on the hood of the vehicle would not have appeared to be excessive force to a reasonable officer in Taylor's position. Officers are generally permitted to "take reasonable steps to protect themselves" in a given situation. United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993). Taylor could have reasonably perceived that, had Frazier not kept the

flashlight from D. Tanner and stopped D. Tanner's perceived resistance, the situation could have

escalated further, and that D. Tanner may have used the flashlight against Frazier.  See McLenagan

v. Karnes, 27 F.3d 1002, 1007-08 (4th Cir. 1994)("We will not second-guess the split-second

judgment of a trained police officer merely because that judgment turns out to be mistaken,

particularly where inaction could have resulted in death or serious injury to the officer and others.").

As the Second Circuit discussed in a similar, although admittedly more extreme, scenario where an

officer and suspect were fighting over a firearm:

> On the facts admitted in Plaintiff's 9(c) Statement, at the moment Officer
> Proulx fired his weapon, Eric was actively resisting arrest, and Proulx was being
> pummelled by more than five people.  The police officer subsequently shot Eric
> "instinctively" in reaction to seeing Eric's hand on the barrel of his gun while the
> two were locked in a struggle.  Thus, on plaintiff's version, Proulx shot Eric in the
> midst of a struggle when the possibility that Eric might gain control of the officer's
> weapon was imminent, a prospect with obvious danger for Proulx.  In such
> circumstances, no rational jury could find that Officer Proulx's decision to use
> deadly force "was so flawed that no reasonable officer would have made a similar
> choice."

Salim v. Proulx, 93 F.3d 86, 91-92 (2d Cir. 1996)(emphasis in original).  It is also undisputed that

M. Tanner was standing immediately next to Frazier.  Taylor could have reasonably concluded that,

given that there was another large and potentially belligerent individual next to Frazier, Frazier was

entitled to quickly defuse the situation for his own safety.  See Salim v. Proulx, 93 F.3d at 91-92.

If Frazier had repeatedly struck D. Tanner forcefully for a longer period of time, there might be

genuine issues of fact whether Taylor observed excessive force.  Here, however, he hit D. Tanner

twice.

Lastly, whether Frazier could have used some other less forceful method other than hitting

D. Tanner with the flashlight on the hood of the vehicle is not material, because his use of the

flashlight in this manner would have appeared reasonable to a reasonable officer in Taylor's

position.  "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in United States v. Sharpe, the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87.  While the head may have been treated as an "Avoid Zone in police baton training" during the training Frazier and Taylor received, Complaint Investigation Report at 6, "'violations of state law and police procedure generally do not give rise to a 1983 claim' for excessive force," West v. Keef, 479 F.3d 757, 759 (10th Cir. 2007).  The Court has also held in the past that "[t]he clearly established law also does not permit a plaintiff to establish a constitutional violation with evidence that the officers violated [standard operating procedures ("SOPs")] and their training" and that "[t]he clearly established law requires the exclusion of any evidence regarding the violation of SOPs and training, because such evidence is irrelevant to the Fourth-Amendment inquiry."  Mata v. City of Farmington, 798 F.Supp.2d 1215, 1231 (D.N.M. 2011)(Browning, J.).  The Court in Mata v. City of Farmington "exclude[d] evidence that the Defendant Officers did not follow SOPs and police training, because this evidence [wa]s not relevant."  Mata v. City of Farmington, 798 F.Supp.2d at 1234.  The Tenth Circuit has also held:

> In the exclusionary rule context, the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a "basis of invalidation would not apply in jurisdictions that had a different practice."  That logic would seem to apply equally to damage suits under § 1983.  This Court has consistently held that the violation of police regulations is

insufficient to ground a § 1983 action for excessive force.  That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefor irrelevant. . . . If Officer Sholtis violated the SOP governing the use of force in effecting arrest, that fact might well be pertinent to the Albuquerque Police Department's future decisions to promote, retain, or discipline him; it is not relevant to determining if Plaintiff's arrest violated the reasonableness requirement of the Fourth Amendment.

Tanberg v. Sholtis, 401 F.3d at 1163-64 (10th Cir. 2005)(citations omitted).

### 3. **In Light of the Surrounding Circumstances, a Reasonable Officer in Taylor's Position Had No Duty to Intervene While Frazier Was Hitting D. Tanner on the Ground.**

Once Frazier had taken D. Tanner to the ground, Taylor had a countervailing concern about protecting herself and Frazier from the potential threat M. Tanner posed.  Because M. Tanner was also a suspect, she had discretion to detain and arrest him instead of intervening in any allegedly excessive force Frazier used against D. Tanner.  Thus, she had no duty to intervene in any potentially excessive force Frazier used against D. Tanner while D. Tanner was on the ground.  Lastly, assuming those countervailing concerns did not undercut her duty to intervene, she did not know or have reason to know that Frazier was using excessive force while D. Tanner was on the ground.

Relatively few cases have dealt with a comparable factual scenario to the one in this case, where another suspect, besides the one alleging that the secondary officer should have intervened, is on the scene and poses a potential threat to officer safety.  The Eleventh Circuit is one of the courts that has dealt with a factually similar case.  In Ensley v. Soper, 142 F.3d 1402 (11th Cir. 1998), officers were investigating a potential robbery at a furniture store.  See 142 F.3d at 1405.  At the scene, one suspect, Ralph, became involved in an altercation with officers.  See 142 F.3d at 1405.  At the same time, the following occurred:

> While several officers subdued Ralph, Johnston and two other officers were
> busy arresting Wesley.   As Wesley concedes, he attempted to come to Ralph's
> assistance when Ralph became entangled with Doyle.   When Wesley grabbed
> Doyle's metal flashlight, Deputy Diane Bagget, soon joined by another officer and
> Johnston, restrained and arrested Wesley.   Johnston then placed Wesley in
> Johnston's patrol car.

142 F.3d at 1405.  Ralph, one of the plaintiffs, alleged that Johnston should have intervened in the

excessive force the other officers were using against him.  See 142 F.3d at 1407.  The Eleventh

Circuit rejected this argument and concluded that summary judgment in favor of Johnston on

qualified immunity grounds was appropriate.  See 142 F.3d at 1407-08.  It concluded that Johnston

had no duty to intervene for the following reasons:

> The Ensleys, however, can point to no case recognizing such a duty on materially
> similar facts to those underlying this case.  Unlike Byrd [v. Clark, 783 F.2d 1002,
> 1007 (11th Cir. 1986)], this is not a case in which an officer is alleged to have stood
> idly by while a fellow officer mistreated a member of the public.  Rather, all of the
> abuse allegedly suffered by Ralph occurred while Johnston was attempting to
> restrain and arrest Wesley.  Without some precedent holding that an officer has a
> duty to abandon his attempt to arrest one armed attacker in order to protect another
> armed attacker against whom other officers may be using excessive force, Johnston
> had discretion to decide whether Wesley or the officers arresting Ralph deserved his
> immediate attention.

142 F.3d at 1407.

Other courts have recognized, at least in the context of intervening in altercations between

inmates, that no duty to intervene into a constitutional violation arises when a government official

would have to place themselves in danger to intervene.  For instance, the United States Court of

Appeals for the Fifth Circuit held that a district court should have entered summary judgment in

favor of some unarmed prison guards who allegedly failed to intervene in a prisoner's beating,

because "no rule of constitutional law requires unarmed officials to endanger their own safety in

order to protect a prison inmate threatened with physical violence" by other inmates.  Longoria v.

Texas, 473 F.3d 586, 593 (5th Cir. 2006).  The Fifth Circuit recognized, however, that "it [wa]s well

established," as a general matter, "that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." Longoria v. Texas, 473 F.3d at 592. The Sixth Circuit reached a similar conclusion when it stated the following: "Although Patmon believes that the guards should have placed themselves between him and Lefler, prison guards have no constitutional duty to intervene in an armed assault by an inmate when the intervention would place the guard in danger of physical harm." Patmon v. Parker, 3 F.App'x 337, 338 (6th Cir. 2001)(unpublished). The United States Court of Appeals for the Fourth Circuit stated in Winfield v. Bass, 106 F.3d 525 (4th Cir. 1997):

> Winfield is unable to point to any decisions establishing that an unarmed prison official exhibits deliberate indifference to an inmate's reasonable need for safety, or acts unreasonably, by failing to intervene immediately in an attack by one prisoner armed with a dangerous weapon on another. Indeed, all of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required.

106 F.3d at 532. The United States Court of Appeals for the Eighth Circuit has also recognized: "[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995). The Tenth Circuit resolved a similar case on somewhat different grounds without squarely addressing the question of duty. See MacKay v. Farnsworth, 48 F.3d 491, 493 (10th Cir. 1995). It concluded that prison officials did not act with deliberate indifference in responding to a situation by attempting to defuse the situation verbally as opposed to physically intervening immediately when the situation arose:

> Here, the undisputed facts show no deliberate indifference on the part of prison officials. Defendants knew plaintiff faced a risk of harm. The measures they took to abate that harm were reasonable. Plaintiff admitted the guards were successful in attempting to break up the fight verbally. In deciding not to physically intervene immediately, the guards observed that plaintiff and the other inmate were evenly matched and that the shank was ineffective. Finally, defendants called for

-83-

additional staff and medical personnel and thus were preparing to intervene when sufficient staff was available in accordance with prison policy.

MacKay v. Farnsworth, 48 F.3d 491, 493 (10th Cir. 1995).

The Court has concluded that, up until Frazier took D. Tanner to the ground, a reasonable officer in Taylor's position would not have observed or had reason to know that Frazier was using excessive force.  Thus, no duty to intervene could have arisen by that time, because it would not have appeared, to a reasonable officer in Taylor's position, that a primary constitutional violation had occurred.  See Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 420 (4th Cir. 1996).  As the Fourth Circuit explained in a similar case:

> We see no need to address the merits of these claims because all are derivative of Appellants claim that Officer Lake used excessive force against Wilson, which was rejected by a jury.  In the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City.

81 F.3d at 420.  While, depending on the facts known to Frazier, Frazier's force may have been excessive from a reasonable officer in Frazier's perspective or there could be genuine issues of material fact on that question, the question before the Court is whether a reasonable officer in Taylor's position would have concluded that Frazier's force was excessive based on the facts known to Taylor.

Taylor had discretion to pursue an arrest of M. Tanner, who was also a suspect in the investigation, as opposed to intervening in any excessive force Frazier may have been using while D. Tanner was on the ground.  It is undisputed that M. Tanner was immediately next to Frazier during Frazier's altercation with M. Tanner.  A reasonable officer in Taylor's position could have concluded that Frazier was in a more vulnerable position to defend himself from third parties while he was focusing on D. Tanner on the ground.  A reasonable officer in Taylor's position could have

concluded that it was a more prudent to secure M. Tanner rather than continue to observe Frazier

or intervene in any potentially excessive force that Frazier used.  D. Tanner has directed the Court

to no authority to support a conclusion that an officer has a "duty to abandon his attempt to arrest

one [potentially dangerous suspect] in order to protect another [potentially dangerous suspect]

against whom other officers may be using excessive force." Ensley v. Soper, 142 F.3d at 1407.  This

situation is similar to the one the Eleventh Circuit faced in Ensley v. Soper:

> The Ensleys, however, can point to no case recognizing such a duty on materially
> similar facts to those underlying this case.  Unlike Byrd, this is not a case in which
> an officer is alleged to have stood idly by while a fellow officer mistreated a member
> of the public.  Rather, all of the abuse allegedly suffered by Ralph occurred while
> Johnston was attempting to restrain and arrest Wesley.  Without some precedent
> holding that an officer has a duty to abandon his attempt to arrest one armed attacker
> in order to protect another armed attacker against whom other officers may be using
> excessive force, Johnston had discretion to decide whether Wesley or the officers
> arresting Ralph deserved his immediate attention.

142 F.3d at 1407.  Taylor did not receive information from Kneier clarifying which of the brothers

assaulted the employee in the bar.  She could have reasonably concluded that both brothers were

moderately to severely intoxicated.  M. Tanner was also likely in an agitated state after observing

what had happened to his brother, as a reasonable officer in Taylor's position could have concluded

from his shouting, and from his taking his jacket off and throwing it to the ground.  M. Tanner

asserted in his affidavit that he took the jacket off and threw it to the ground to get Frazier's

attention.  That fact is not legally relevant in this context, however, as courts may not consider a

suspect's subjective intentions for their actions when those intentions are unknown to the officer.

See Reeves v. Churchich, 484 F.3d at 1253 ("Thus, just as we objectively examine a police officer's

conduct under the Fourth Amendment, the Reeves' subjective motives behind their failure to submit

are irrelevant.").

      The Court finds persuasive the Eleventh Circuit's logic that Taylor "had discretion to decide

whether [M. Tanner] or the officer[] arresting [D. Tanner] deserved h[er] immediate attention." Ensley v. Soper, 142 F.3d at 1407. As Taylor has characterized the situation, she faced a difficult choice, with one of her choices being particularly undesirable, because she would have had to make herself and Frazier vulnerable to an attack from M. Tanner. She could either attempt to stop Frazier, giving M. Tanner a chance to escape or potentially attack both her and Frazier, or concentrate on M. Tanner until she had him in custody.[26] Imposing a duty on Taylor to take one course of action over the other would force officers into a dangerous choice. That conclusion rings particularly true given the short period of time in which this entire event transpired, with approximately three minutes and forty seconds passing from the time Taylor arrived at the scene to the time McCoy arrived on the scene. Additionally, Frazier had D. Tanner on the ground for approximately twenty seconds before he began formalizing the arrest and placing D. Tanner in handcuffs. A rule such as the one D. Tanner has proposed "would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11. "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d at 1230.

By the same token, a reasonable officer in Taylor's position would have no obligation to intervene when the officer could reasonably conclude that doing so would place that officer or a fellow officer in physical danger. Taylor did not receive information from Kneier clarifying which of the brothers assaulted the employee in the bar. She had obtained no information clarifying who

---

[26]While the parties have presented evidence that Taylor and McCoy put M. Tanner in custody by handcuffing him, neither party has presented evidence that reveal the exact reasons why these officers put M. Tanner in custody, other than that he was agitated and upset.

fired pepper spray in the bar.  She could have reasonably concluded that both brothers were moderately to severely intoxicated.  M. Tanner was also in a potentially agitated state after observing what had happened to his brother, as a reasonable officer in Taylor's position could have concluded from his shouting, and from his taking his jacket off and throwing it to the ground.  The Eleventh Circuit in <u>Ensley v. Soper</u> dealt with an analogous situation where the second suspect on the scene "attempted to come to [the] assistance" of the first suspect who was in an altercation with police officers.  142 F.3d at 1405.  Officers who were not involved in the original altercation prevented the second suspect from attempting to intervene by restraining and arresting the second suspect.  <u>See</u> 142 F.3d at 1405.  The Eleventh Circuit concluded that these officers who restrained the second suspect were, as a matter of law, not "in a position to intervene."  142 F.3d at 1407-08.  Other courts have treated analogous situations in the prison setting as the government official not having a duty to intervene as opposed to not being in a position to intervene.  <u>See</u>, <u>e.g.</u>, <u>Prosser v. Ross</u>, 70 F.3d at 1008 ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.").  Because there is a dearth of authority on factually comparable situations and no Tenth Circuit authority on point, the Court will address this issue in the context of both duty and whether Taylor had a realistic opportunity to intervene.

Officer safety is a legitimate and weighty consideration in the Fourth Amendment context.  <u>See</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 110 (1977)("We think it too plain for argument that the State's proffered justification -- the safety of the officer -- is both legitimate and weighty.  'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'").  Imposing a duty on officers to intervene when an officer could reasonably conclude that doing so would require that officer to put his or her safety, and the safety of other

officers, at risk runs counter to this principle.  Cf. Prosser v. Ross, 70 F.3d at 1008 ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.").   The current situation is distinguishable from one "in which an officer is alleged to have stood idly by while a fellow officer mistreated a member of the public."  Ensley v. Soper, 142 F.3d at 1407.  Rather than standing by as an observer, Taylor was actively pursuing legitimate law enforcement goals.   The Court concludes that, when an officer has a reasonable belief that intervening will put him or herself, or a fellow officer, in danger, that an officer has no duty to intervene until the potential danger abates. Thus, while Taylor was dealing with M. Tanner and then Descheeny who later appeared on the scene, which was at least until Frazier was almost done handcuffing D. Tanner, she had no duty to intervene.  Frazier had D. Tanner on the ground for approximately one minute before he completed handcuffing D. Tanner.  See Frazier Dashboard Camera at 23:47:15-48:45.

Even if the Court were not to treat these countervailing concerns as a question of duty, Taylor would not have known or had reason to know Frazier was using excessive force.  It is true that Frazier beat D. Tanner several times with the flashlight while D. Tanner was on the ground. Such beating occurred, however, for approximately twenty seconds until Frazier pulled out his handcuffs to place on D. Tanner.  D. Tanner has not argued, and has put forward no facts to suggest, that Frazier used excessive force during the handcuffing process.  During the beating, one can hear Frazier on the video footage telling D. Tanner to roll over on his stomach while Frazier is beating him, after which time Frazier gets in a position to handcuff D. Tanner.  See Frazier Dashboard Camera at 23:47:15-47:55.  D. Tanner put forth an asserted fact that Taylor could hear Frazier's yelling while dealing with M. Tanner.  While it is possible that she also heard Frazier tell D. Tanner to roll over on his stomach, which would have led her to reasonably conclude that Frazier said to

make D. Tanner get in a position where Frazier could handcuff him, the Court believes that drawing all reasonable inferences in D. Tanner's favor would support the conclusion that she did not hear what Frazier said. The Court reaches this conclusion in part because of how loud D. Tanner was yelling. Nevertheless, she had a limited amount of information about what was occurring even when drawing all reasonable inferences in D. Tanner's favor. While it is a reasonable inference that she looked back to see D. Tanner, based on the evidence D. Tanner presented, while she was dealing with M. Tanner, it is not a reasonable inference that she could have focused her full attention on what was occurring between them while also dealing with M. Tanner. D. Tanner's previous conduct indicated that he was an ongoing risk until properly restrained, which an officer in Taylor's position could have reasonably concluded qualified as resisting arrest and attempting to assault an officer. It was also unclear whether either D. Tanner or M. Tanner had pepper spray in their possession. She had probable cause to believe D. Tanner constituted a serious threat of physical harm either to her or to Frazier. She had received from Kneier that D. Tanner was potentially violent and potentially severely intoxicated. Under the circumstances, she did not observe or have reason to know that Frazier was using excessive force. Frazier struck D. Tanner several times while he was on the ground, but after a period of twenty seconds he began to handcuff D. Tanner. According to D. Tanner's asserted facts, she was at times looking back in Frazier and D. Tanner's direction, and thus would have at some point seen that Frazier stopped beating D. Tanner and was placing him in handcuffs.

Officers are permitted to use a greater degree of force when they reasonably believe that a suspect is resisting arrest or attempting to harm them, even if that belief is mistaken -- as long as the mistake is reasonable. See Jiron v. City of Lakewood, 392 F.3d at 415 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in

using more force than in fact was needed."); Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d

at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action;

by then, it is 'often . . . too late to take safety precautions.'").  D. Tanner's conduct indicated that

he could potentially be violent until properly restrained.  While these extra blows while D. Tanner

was on the ground "may later seem unnecessary in the peace of a judge's chambers," that does not

mean that they "violate[] the Fourth Amendment."  Lundstrom v. Romero, 616 F.3d at 1126.  If a

judge later must be cautious about making a judgment about the appropriateness of force, a fellow

officer on the scene working with other officers should be accorded the same ability to be cautious

about rushing to judgment in light of a developing situation.  The "calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second judgments --

in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is

necessary in a particular situation."  Lundstrom v. Romero, 616 F.3d at 1126.  D. Tanner was still

a threat until he was handcuffed.  He continued to engage in erratic conduct by banging his head

against Frazier's vehicle even after handcuffed.  Under the circumstances, a reasonable officer in

Taylor's position would not have concluded that they had a duty to intervene on the basis that

Frazier was using excessive force.

### 4.    Assuming Taylor's Conduct Constituted a Constitutional Violation, Her Conduct Did Not Violate Clearly Established Law.

In evaluating whether the right was clearly established, a district court considers whether the

right was sufficiently clear that a reasonable government employee in the defendant's shoes would

understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist.,

473 F.3d at 1327.  "In determining whether the right was 'clearly established,' a court assesses the

objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the

contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186.  The Tenth Circuit reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "might make a constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  In Casey v. City of Federal Heights, the Tenth Circuit re-emphasized its sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  509 F.3d at 1284 (citing Pierce v. Gilchrist, 359 F.3d at 1298).  Thus, "when an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of law are not inherently incapable of giving fair and clear warning."  Hope v. Pelzer, 536 U.S. at 741.

In the context of excessive force cases, the Tenth Circuit has in the past held that the law regarding excessive force is clearly established, so any officer who uses excessive force violates clearly established law.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("In 1992, we held that Graham itself was enough to constitute clearly established law in an excessive force case.").  The Tenth Circuit has more recently noted that the Supreme Court has since recognized that a clearly established standard that does not account for the facts of the individual excessive force cases is impermissible.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("More recently, however, the Supreme Court has held that Graham's 'general proposition . . . is not enough' to turn all uses of excessive force into violations of clearly established law." (emphasis in original)(quoting Saucier

v. Katz, 533 U.S. at 201-02)).  In Saucier v. Katz, the Supreme Court articulated the distinction

between finding whether particular conduct qualifies as excessive force and whether the law making

that conduct a constitutional violation was clearly established:

> The qualified immunity inquiry, on the other hand, has a further dimension.
> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can
> be made as to the legal constraints on particular police conduct.  It is sometimes
> difficult for an officer to determine how the relevant legal doctrine, here excessive
> force, will apply to the factual situation the officer confronts.  An officer might
> correctly perceive all of the relevant facts but have a mistaken understanding as to
> whether a particular amount of force is legal in those circumstances.  If the officer's
> mistake as to what the law requires is reasonable, however, the officer is entitled to
> the immunity defense.
>
> Graham does not always give a clear answer as to whether a particular
> application of force will be deemed excessive by the courts.  This is the nature of a
> test which must accommodate limitless factual circumstances.  This reality serves
> to refute respondent's claimed distinction between excessive force and other Fourth
> Amendment contexts; in both spheres the law must be elaborated from case to case.
> Qualified immunity operates in this case, then, just as it does in others, to protect
> officers from the sometimes "hazy border between excessive and acceptable force,"
> and to ensure that before they are subjected to suit, officers are on notice their
> conduct is unlawful.

Saucier v. Katz, 533 U.S. at 205-06 (citations omitted).  The Tenth Circuit recently elaborated on

this principle when it stated: "That is, the question is not whether the general right to be free from

excessive force is clearly established, but whether Morris had a clearly established right under the

facts of this case."  Morris v. Noe, No. 11-5066, 2012 WL 604170, at *7 (10th Cir. Feb. 27, 2012).

Under the facts of this case, assuming Taylor's conduct violated the Fourth Amendment, she

made a reasonable mistake whether Frazier's use of force was excessive.  Given the short period of

time over which Frazier's assault on D. Tanner occurred -- a total of approximately forty-five

seconds from the time Frazier slammed D. Tanner on the hood of the vehicle until Frazier began

handcuffing D. Tanner -- and the variety of circumstances indicating that D. Tanner posed a threat

to the officers, any mistake Taylor made regarding Frazier's use of force was reasonable.  Under the

-92-

facts presented -- with no more than forty-five seconds passing until Frazier stopped choking and beating Tanner to began handcuffing him, and with Taylor pursuing legitimate law enforcement duties during part of that time rather than standing by idly as an observer -- any violation she may have committed was comparably minor to more egregious violations.  A violation that is comparably minor requires a higher level of specificity from prior case law to put the officer on notice.  "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  For example, a more egregious case would have occurred if Frazier was shooting a firearm at D. Tanner in response to the struggle on the hood of the vehicle.

While the Court on its own located authority suggesting that a flashlight could qualify as a deadly weapon, D. Tanner has directed the Court to no authority indicating that a flashlight is a deadly weapon, or to authority establishing that Taylor made an unreasonable mistake whether Frazier was using deadly force.  The inquiry whether a particular weapon qualifies as a deadly weapon can turn on a case's particular facts -- assuming courts have not already decided that a particular use of force, such as firing a handgun at someone, per se qualifies as using deadly force.  See Chew v. Gates, 27 F.3d at 1453 (9th Cir. 1994)("Whether a particular instrument of force qualifies as an instrument of deadly force is a question of fact.").  Accord Robinette v. Barnes, 854 F.2d at 912 ("Thus, whether deadly force has been used to seize a criminal suspect must be determined in the context of each case.").  As the Ninth Circuit explained in a case where it was unsettled whether a particular instrument constituted the use of deadly force:

> On the one hand, it could be said that it was not clearly established that any right of Salinas would be violated by this use of hobble restraints because their use in this manner had not been declared to be deadly force by the courts, by the consensus of academics, or by the law enforcement community in general.

On the other hand, it could be said that the use of hobble restraints in the manner they were used here is a form of deadly force, and the law is clearly established that deadly force could not be used under the circumstances of this case. That would move the inquiry to the second level, but even then the lack of case authority regarding use of these or similar devices and the absence of scientific or law enforcement agreement about the use of restraints in that way would indicate that a reasonable officer could have believed that his conduct was lawful.

The district court made its decision at the former level-the first <u>Act Up!</u> inquiry. We think that for present purposes it makes no real difference whether the first or second level of inquiry is the proper one. In either event, it cannot be said that the officers were either knowing law violators or plainly incompetent. In either event, the officers were entitled to qualified immunity.

<u>Salinas v. Cooke</u>, 103 F.3d 140, 1996 WL 692007, at *1-2 (9th Cir. 1996)(unpublished table decision). The Tenth Circuit has also recognized that many police weapons may or may not qualify as deadly force depending on the facts of a given case: "It is no secret that many tools in law enforcement can potentially inflict serious bodily harm or even death. Some of these tools, however, also have great potential to resolve situations without resort to comparatively more lethal force." <u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1315-16. While, viewing all the facts in the light most favorably to D. Tanner, the Court treated Frazier's beating of D. Tanner with a flashlight in the head as the use of deadly force, Taylor could have still made a reasonable mistake whether that use of force constituted deadly force. <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. at 205-06. Frazier's use of the flashlight would not have appeared, to a reasonable officer in Taylor's position, so egregious that any mistake she made regarding the appropriate level of force was unreasonable.

D. Tanner argues generally that "[t]he duty of a police officer to intervene when excessive force is being used in his or her presence and the officer has the ability to interceded is clearly established." Response at 22 (citing <u>Vondrak v. City of Las Cruces</u>, 535 F.3d at 1210). D. Tanner is correct that the Tenth Circuit has recognized that an officer's duty to intervene is clearly established. <u>See</u> <u>Vondrak v. City of Las Cruces</u>, 535 F.3d at 1210. That does not answer the

question, however, whether the primary violation, the use of excessive force under these facts, would have been clearly established to an officer in Taylor's position -- who is only derivatively liable if there is a primary violation.  See Hinkle v. City of Clarksburg, W. Va., 81 F.3d at 420. While he has argued that Frazier used excessive force, he has made no distinction between whether Frazier used excessive force and whether any resulting constitutional violation would have been clearly established to a reasonable officer in Taylor's position.  Qualified immunity shifts the burden to the plaintiff to establish that the officer violated clearly established law.  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107.  D. Tanner has made no such showing here, and the Court does not otherwise believe that the law regarding any such excessive force violation, from the perspective of a reasonable officer in Taylor's position, was clearly established.  Particularly given the concerns about officer safety present in the situation Taylor faced, the Court believes this case is one that falls within the "hazy border between excessive and acceptable force" where officers are entitled to qualified immunity.  Saucier v. Katz, 533 U.S. at 205-06.

If the Court were to treat the situation where Taylor should have allegedly intervened while D. Tanner was on the ground as a question of duty, the Court does not believe that a duty to intervene was clearly established under the facts of this case given the countervailing concerns of officer safety and detaining M. Tanner.  It is true that the Tenth Circuit has recognized that there is a general duty to intervene when a secondary officer observes or has reason to know that a primary officer is committing a constitutional violation.  See Vondrak v. City of Las Cruces, 535 F.3d at

1210.  Nevertheless, the Court has not located, and D. Tanner has not directed the Court to, any Tenth Circuit authority addressing a situation like the one in this case -- where there is a potential threat to officer safety based on another suspect at the scene and where the other suspect may be responsible for criminal activity.  The law is more complex than the general proposition that officers have a duty to intervene when they see a constitutional violation, particularly when the alleged improper conduct occurred over a brief period of time while the secondary officer faced a potentially dangerous situation.  As the Eleventh Circuit has recognized, the situation before the Court is distinguishable from one "in which an officer is alleged to have stood idly by while a fellow officer mistreated a member of the public."  Ensley v. Soper, 142 F.3d at 1407.  The Tenth Circuit has recently reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "might make a constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original). This case is one where those distinctions might make a constitutional difference, as Taylor faced genuine concerns that intervening into Frazier's conduct would have allowed M. Tanner to escape or would have opened herself and Frazier to an attack from M. Tanner.  See Ensley v. Soper, 142 F.3d at 1407-08.  Thus, the Court does not believe that the duty to intervene was clearly established under the facts of this case.

## C.    TAYLOR HAD NO OBLIGATION TO INTERVENE IN MCCOY'S CONDUCT IN LIGHT OF THE CIRCUMSTANCES.

After McCoy had arrived, he moved over to Frazier's vehicle where D. Tanner was in handcuffs.  D. Tanner was banging his head against the hood of the vehicle.  McCoy then placed his hands around D. Tanner's head and neck for approximately three seconds in a choking manner.

In the context of excessive force, the Tenth Circuit has explained: "The right to make an

arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Lundstrom v. Romero, 616 F.3d at 1126 (10th Cir. 2010)(quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  The Tenth Circuit has also recognized:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  And we take seriously that this calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

Lundstrom v. Romero, 616 F.3d at 1126.  When determining whether an officer's conduct constitutes excessive force during the process of an arrest, a court assumes that the arrest was lawful. See Romero v. Story, 2012 WL 586698, at *7 ("Instead, the district court must then analyze the excessive force inquiry under the assumption the arrest was lawful.").

That McCoy placed his hands around D. Tanner's head and neck for approximately three seconds in a choking manner would not have made Taylor believe he was using excessive force. Taylor had already observed that D. Tanner posed a significant risk to officer safety and that he would resist arrest.  While D. Tanner was handcuffed and thus posed a reduced risk of danger, he was violently banging his head against Frazier's vehicle before McCoy restrained D. Tanner in a choking manner.  After McCoy took this action, there is no evidence indicating that McCoy had any other physical contact with D. Tanner.  Under the circumstances, Taylor could have reasonably concluded that this force was necessary to prevent D. Tanner from harming himself or from attempting to harm the other officers present at the scene.  See Tennessee v. Garner, 471 U.S. 1, 21 (1985)(recognizing that whether the suspect "posed any physical danger to himself or others" is an appropriate consideration in the excessive force analysis).  From the perspective of a reasonable

officer in Taylor's position, D. Tanner could have hurt himself if he continued to bang his head against the hood of the vehicle. Under the circumstances, a reasonable officer in Taylor's position would not have observed or had reason to believe that McCoy was using excessive force.

## III.   ASSUMING FRAZIER AND MCCOY USED EXCESSIVE FORCE FROM TAYLOR'S PERSPECTIVE, TAYLOR DID NOT HAVE A REALISTIC OPPORTUNITY TO INTERVENE.

Additionally, even if a reasonable officer in Taylor's position would have observed or had reason to know that Frazier or McCoy used excessive force, Taylor did not have a realistic opportunity to intervene based on the short period of time during which their conduct occurred and the surrounding circumstances. The Tenth Circuit has recognized whether an officer has a realistic opportunity to intervene is generally a question of fact. See Hall v. Burke, 12 F.App'x at 861. Specifically, it has held:

> In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

Hall v. Burke, 12 F.App'x at 861.

Courts generally focus on how long the constitutional violation occurred when determining whether an officer had a realistic opportunity to intervene. For instance, the United States Court of Appeals for the Seventh Circuit held that a secondary officer did not have a realistic opportunity to intervene when he "did not have an opportunity to participate in the physical apprehension of Thompson or to assist or prevent Boggs from acting as he did because Officer Boggs' restraining and controlling of Thompson was accomplished before [the secondary officer] even had an opportunity to get out of his squad car." Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir. 1994). The Ninth Circuit held that a group of prison guards had no realistic opportunity to intervene when they

did not know force would be used and were physically incapable of preventing some incidents "which transpired in a matter of seconds." Ting v. United States, 927 F.2d 1504, 1511-12 (9th Cir. 1991). The Second Circuit found that an officer did not have a realistic opportunity to intervene when "three blows were struck in such rapid succession." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). The Tenth Circuit found that there were genuine issues of material fact regarding whether an officer had sufficient time to intervene when the unlawful arrest lasted "between three and five minutes." Fogarty v. Gallegos, 523 F.3d 1147, 1164 (10th Cir. 2008). The Eleventh Circuit concluded that a genuine issue of material fact existed whether an officer had sufficient time to intervene when two minutes had passed after another officer improperly allowed an attack dog to harm a suspect. See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 (11th Cir. 2000). The Court has concluded in the past that eleven seconds passing was, under the circumstances of that case, sufficient time to potentially create a realistic opportunity to intervene. See Mata v. City of Farmington, 791 F.Supp.2d at 1157.

Some courts have also focused on the surrounding circumstances to determine if an officer had a realistic opportunity to intervene -- such as if there is another suspect at the scene or a potential risk of danger in intervening. The Eleventh Circuit recognized, as two alternative conclusions for its results in Ensley v. Soper, that the secondary officer did not have an opportunity to observe any excessive force the other officers used, and that the secondary officer "had little choice but to remain" with the other suspect until the suspect could be brought "under control and secured" in the secondary officer's vehicle:

> After thoroughly examining the Ensleys' submission, we see no evidence in the record that might show that Johnston observed his fellow officers' alleged abuse of Ralph or that he had opportunity to intervene. As all the parties agree, Johnston and the two other officers who together arrested Wesley observed the initial altercation between Ralph and officer Doyle. Once Wesley joined the fray, however, Johnston

became actively involved in the arrest of Wesley; Johnston therefore claims that he did not observe any use of excessive force against Ralph.  In fact, even Wesley concedes that he did not see any abuse; since Johnston was with Wesley, Wesley's testimony corroborates Johnston's claim that he was not in a position to know Ralph's circumstances.  Against this evidence, the Ensleys offer nothing that might show that Johnston could have observed or did observe excessive force.  Finally, Johnston had little choice but to remain with Wesley while he and his fellow officers brought Wesley under control and secured him in Johnston's vehicle.  Under these circumstances, we believe that no reasonable juror could find that Johnston was "in a position to intervene."  Therefore, even if the district court is correct that "a reasonable person could conclude that . . . [Johnston's fellow officers] used excessive force," we see no evidence that might lead a reasonable juror to conclude that Johnston violated any clearly established right of Ralph to intervention.  Again, Johnston is entitled to qualified immunity and thus summary judgment on the Ensleys' claim regarding Johnston's alleged failure to intervene.

142 F.3d at 1407-08.

While roughly twenty seconds passed until Frazier began handcuffing D. Tanner, Taylor had no realistic opportunity to intervene in any constitutional violation that Frazier may have committed while D. Tanner was on the ground, because she "had little choice but to remain with" M. Tanner while she brought him "under control and secured him." Ensley v. Soper, 142 F.3d at 1407-08.  An officer in Taylor's position could have reasonably believed that, if an officer did not keep M. Tanner occupied, he could have posed a threat to both Taylor and Frazier.  As Taylor has characterized the situation, she faced a dangerous choice.  She could either attempt to stop Frazier, giving M. Tanner a chance to escape or potentially attack both her and Frazier, or concentrate on M. Tanner until she had him in custody.  Particularly given the short period of time in which this entire event transpired, with Frazier having D. Tanner on the ground for approximately twenty seconds before he began formalizing the arrest and placing D. Tanner in handcuffs, imposing on Taylor a duty to take one course of action over the other would force officers to place themselves in harm's way to avoid civil liability.  Such a rule might be appropriate if the events took place over a longer period of time, or if the danger had abated, but is not appropriate here.  "Such a rule would unduly hamper the police's

ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11. "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d at 1230.

Taylor did not receive information from Kneier clarifying which of the brothers assaulted the employee in the bar. It was also unclear who fired the pepper spray in the bar. She could have reasonably concluded that both brothers were moderately to severely intoxicated. M. Tanner was also in a potentially agitated state after observing what had happened to his brother, as a reasonable officer in Taylor's position could have concluded from his shouting, and from his taking his jacket off and throwing it to the ground. The Eleventh Circuit in Ensley v. Soper dealt with an analogous situation where the second suspect on the scene "attempted to come to [the] assistance" of the first suspect who was in an altercation with police officers. 142 F.3d at 1405. Officers who were not involved in the original altercation prevented the second suspect from attempting to intervene by restraining and arresting the second suspect. See 142 F.3d at 1405. The Eleventh Circuit concluded that these officers who restrained the second suspect were, as a matter of law, not "in a position to intervene." 142 F.3d at 1407-08. Holding that an officer has a realistic opportunity to intervene in a situation comparable to this one would jeopardize officer safety. See Pennsylvania v. Mimms, 434 U.S. at 110 ("We think it too plain for argument that the State's proffered justification -- the safety of the officer -- is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'").

While the Court finds that summary judgment is appropriate, the Court will not rely on some of Taylor's arguments. She has argued that, because she and Taylor were from different law enforcement agencies, she would have been more hesitant to intervene. The Fifth Circuit has

rejected an argument that, when two officers are from different law enforcement agencies, the officer who allegedly failed to intervene is as a matter of law entitled to summary judgment on qualified immunity grounds.  See Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995)("The fact that Fox and Fant were from different law enforcement agencies does not as a matter of law relieve Fant from liability for a failure to intervene.").  Because the Tenth Circuit has held that it is generally a question of fact whether an officer has a realistic opportunity to intervene, the Court finds the Fifth Circuit's logic persuasive on this issue.  See Hall v. Burke, 12 F.App'x at 861.  That officers are from different law enforcement agencies is a fact that may influence whether there is a realistic opportunity to intervene or the extent to which the secondary officer should have deferred to the primary officer, but that fact does not entitle Taylor to summary judgment as a matter of law. Taylor has also argued that both D. Tanner and Frazier were larger than her, making it more difficult for her to intervene.  The parties have not, however, presented any asserted facts regarding the differences in height, weight, and size among the individuals involved in this case.  The Court only has the information available on the video footage to assess the relative size differences in the individuals.  Furthermore, the Court does not believe a size difference would, as a matter of law, entitle Taylor to summary judgment on the basis that she did not have a realistic opportunity to intervene.  That question is generally a question of fact.  See Hall v. Burke, 12 F.App'x at 861. While the size difference may be a factor in that analysis, here it is neither a determinative nor necessary factor for the Court to use in its decision to grant summary judgment for Taylor.

Lastly, McCoy had D. Tanner in a choking position for approximately three seconds. Officers cannot realistically be expected to stop conduct "which transpired in a matter of seconds." Ting v. United States, 927 F.2d at 1511-12.  This period of time is even shorter than that the Court saw in Mata v. City of Farmington -- eleven seconds.  See Mata v. City of Farmington, 791

F.Supp.2d at 1157.  Three seconds -- from the time McCoy placed his hands around D. Tanner's head until the time McCoy removed his hands -- is too short of a period of time for an officer to have a realistic opportunity to intervene, particularly when the undisputed facts indicate that Taylor was not participating in D. Tanner's arrest when Frazier and McCoy were finalizing the arrest.

　　　　**IT IS ORDERED** that Defendant Misty Taylor's Motion for Summary Judgment Based on Immunity, filed June 6, 2011 (Doc. 16), is granted.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

*Counsel:*

Arlon L. Stoker
Farmington, New Mexico

　　　*Attorney for the Plaintiff*

Ronald J. Childress
Klecan & Childress
Albuquerque, New Mexico

　　　*Attorneys for Defendant San Juan County Sheriff's Office and Terry McCoy*

Michael Dickman
Santa Fe, New Mexico

　　　*Attorney for Defendant Dale Frazier*

Cristin M. Heyns
Lisa Mann
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

　　　*Attorneys for Defendants Farmington Police Department, Misty Taylor, and
　　　　the City of Farmington*

-103-